1  DAVID W. BROWN, Calif. SBN 99389
2  Attorney at Law
   665 Munras Ave., Suite 210
3  Monterey, CA 93940
   Tel: (831) 649-8211
4  Fax: (831) 649-2376
   Email: DavidWayneBrown@aol.com
5
   Attorney for Plaintiffs
6  JASON J. ADAMSKI and
   CHERYL A. ADAMSKI
7

8            UNITED STATES DISTRICT COURT
9
        NORTHERN DISTRICT OF THE STATE OF CALIFORNIA
10
                 SAN JOSE DIVISION
11

12 JASON J. ADAMSKI,                )        No. _____
   CHERYL A. ADAMSKI,               )
13                                  )        DECLARATION OF PLAINTIFF
                        Plaintiffs, )        CHERYL ADAMSKI IN SUPPORT
14                                  )        OF APPLICATION FOR ISSUANCE
   -vs-                             )        OF ORDER TO SHOW CAUSE,
15                                  )        AND IN SUPPORT OF ISSUANCE
   PAMELA A. MARTIS, in her capacity )       OF TEMPORARY RESTRAINING
16 as garrison commander, Presidio of )      ORDER
   Monterey, United States Army,    )
17                                  )
                        Defendant.  )
18 _____ )

19      I, CHERYL A. ADAMSKI, declare as follows:

20      1. I am a plaintiff in this proceeding. I make this declaration in support of my and

21 my husband's application for issuance of a temporary retraining order.

22      2. On or about March 1, 2007, I and my husband, JASON J. ADAMSKI, entered

23 into a one year lease for a single-family house located at 204 Salerno Road, Seaside,

24 Monterey County, California, with an entity known as The Parks at Monterey Bay.  A

25 copy of the lease is attached hereto as Exhibit A. I am informed and believe that the

26 property is located on a military enclave known as Ord Military Community and/or

27 Presidio of Monterey Annex (hereinafter "OMC/POMA"), and that The Parks at Monterey

28

1  Bay, is a partnership among entities known as Clark Realty and Pinnacle Realty, both
2  California corporations or partnerships, the United States Army, and the United States
3  Navy, under the Military Housing Privatization Initiative Act of 1996.  However, neither I
4  nor my husband are in the military, and neither of us are military dependents. We advised
5  the management of The Parks at Monterey Bay that we are civilians, and were advised, in
6  turn, that some of the housing The Parks at Monterey Bay administered was being rented
7  to civilians. After my husband and I signed the lease, we moved into the property for use as
8  our residence.

9       3. The house in which my husband and I reside, though located on a military
10  enclave, is on what used to be known as Fort Ord, a former Army base. I am informed and
11  believe that much of the land constituting the former Fort Ord has been conveyed to the
12  City of Seaside and other civilian municipal and other entities, but OMC/POMA , where
13  our home is located, remains under Army command and federal criminal  jurisdiction.
14  OMC/POMA  is an open military housing community, in the sense that it is not guarded or
15  fenced off from the now-civilian areas of the former Fort Ord. The area is accessible from
16  roads which are now under civilian municipal ownership and control, and there are no
17  guards, fences, or other clear barriers which separate it from the surrounding civilian
18  communities of Seaside and unincorporated Monterey County. When I drive to or from
19  our home to or from any part of Monterey County, I do not pass barriers, gates, or guards,
20  and, indeed, it is difficult to know where the exact boundaries between OMC/POMA and
21  the surrounding communities are located. For example, the former "North-South Road" of
22  the former Fort Ord is now known as General Jim Moore Boulevard, and it stretches about
23  seven miles from Del Rey Oaks north to Marina. Part of that road is policed by federal
24  police whose vehicles I have seen there, but other parts are, I am informed and believe,
25  policed by civilian police of the cities of Del Rey Oaks, Seaside, and Marina, and of
26  California State University Monterey Bay. Although part of General Jim Moore Blvd. sits
27  on OMC/POMA, I cannot tell where the exact boundaries are, because there are no guards,
28  gates, or fences to act as a barrier to civilian traffic.  That is true of most if not all of the

2

entire OMC/POMA community.  It's not a military base in the traditional sense, but, rather a military housing area (in which units are rented sometimes to civilians like my husband and me) with a fire and federal police station, a gas station, a Burger King, and a commissary.

5. My husband, JASON J. ADAMSKI was convicted, in the state of Ohio, in 1999, of an offense known as "attempted gross sexual imposition" on a minor, an offense which requires him to register, pursuant to California law, as a sex offender with the local authorities.  I am informed and believe he has complied with this law, and is, to date, in compliance with it.

6. I am informed and believe that in late April or early May 2007, an unknown resident of OMC/POMA discovered, apparently from an Internet search of California's Megan's Law Internet database, that my husband was in fact a registered sex offender. This person apparently reported the same to our landlord, The Parks at Monterey Bay, which entity then advised other residents in writing, as attached hereto as Exhibit B.

7. I filled out my and my husband's joint rental application, and he and I signed it. In it, we did not disclose my husband's conviction, because I thought, in good faith, at the time, that we were not obliged to report any conviction older than the seven-year period I understood to be applicable to background checks governed by state or federal law.  I am still not certain we were obliged to disclose it.

8. On or about May 21, 2007, I and my husband received a "bar letter" addressed to him and signed by Colonel Pamela MARTIS, the garrison commander of the entire Presidio of Monterey complex (which includes the closed military base in Monterey, known as the Defense Language Institute), directing my husband to refrain from coming onto OMC/POMA. A copy is attached hereto as Exhibit C. It has the effect of evicting my husband from our home, under threat of arrest by federal police if he is found at home, or going to or from home, and under threat of prosecution in federal court for trespassing.

9. Although I and my husband were give 30 days' notice, we spent much of that time finding an attorney willing to represent us, and the rest of that time having our attorney, David W. Brown of Monterey, negotiate with Army JAG attorneys representing Colonel MARTIS.  We had Mr. Brown begin preparing litigation documents only after

3

exhausting all negotiations. Today, June 21st, is the day my husband is required, by the terms of Colonel MARTIS' bar letter, to refrain from going to or from, or being found in, our home. By a fortunate coincidence, my parents, who also live in Monterey County, go on vacation tomorrow, and my husband and I are house sitting their home for a week and a half. This, however, is a temporary arrangement, and I and my husband may not be allowed to stay with my parents after my parents come back from vacation.

10. I am aware that I can live at home, and that the bar letter applies only to my husband. However, if he is not allowed to live with me, I will suffer great hardship. On June 7, 2007, I gave birth to our baby daughter, Ava, by emergency caesarian-section. My doctor says I am to be considered disabled until mid-August, and there are many activities I cannot do, including driving and lifting anything heavier than our seven-pound daughter. I cannot run around looking for new housing. In addition, I need to have my husband with me, at home, to assist me with many household chores. If I were to move elsewhere, to be with my husband, I would be in violation of the terms of our lease, which expires February 29, 2008, and which prohibits abandoning the premises or subletting.

11. Accordingly, I am asking the Court to issue a temporary restraining order which restrains Colonel MARTIS from having my husband arrested, and from otherwise interfering with my husband's right to live at home with me, pending a hearing on our motion for issuance of a preliminary injunction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 21, 2007 at Monterey, California

CHERYL A. ADAMSKI

4

The Parks at Monterey Bay

PINNACLE
An American Management Services Company

# RENTAL AGREEMENT

THIS LEASE is executed on **March 1, 2007** between **The Parks at Monterey Bay** (herein called "Landlord") and **Cheryl A. Adamski and Jason J. Adamski** (herein called "Resident").

LEASED PREMISES: The Leased Premises are located in the City of **Seaside**, County of **Monterey**, State of **CA** and commonly described as **204 Salerno Rd., Seaside, CA 93955**.

TERM: This Lease shall be for a **1 year** Term commencing **March 1, 2007** (Commencement Date), continuing through **February 29, 2008** and automatically continuing after the termination thereof on a month-to-month basis unless either party notifies the other party in writing at least thirty (30) days prior to the termination of the **1 year** Term of Resident's intent to vacate the Leased Premises pursuant to the provision of paragraph A of Section 4.

RESIDENT OCCUPANCY: Resident warrants that only the following named individuals will occupy the Premises: **Cheryl A. Adamski (4/15/1969) and Jason J. Adamski (6/10/1971)**.

By this Lease Agreement executed on the above date, Landlord and Resident mutually covenant and agree as follows:

## SECTION 1: GENERAL AGREEMENT.

Landlord leased to Resident the above-described Premises, which Resident accepts from the Landlord for the Term, beginning with the Term Commencement Date, at the Total Monthly Rent indicated.

## SECTION 2: PAYMENT OF TOTAL MONTHLY RENT.

Base rent **$1,475.00** + parking **$0.00** + pet: **$0.00** = TOTAL MONTHLY RENT of **$1,475.00**

Resident agrees to pay Landlord in advance, at the office of the Landlord's Resident Manager, or at such other places as may be designated by Landlord, as follows:

1st full month **March 1, 2007** to **March 31, 2007** = **$1,475.00** payable upon occupancy.

Rent for remaining term **$1,475.00** per month commencing on **April 1, 2007**, and thereafter on the **1st** day of each succeeding month.

Payment must be made to the owner/agent to the following address: **1301 Leahy Road, Monterey, CA 93940**, or such other location as Landlord may specify from time to time. Telephone number for the above address: **(831) 644-0490**. Payments made in person shall be delivered to owner/agent between the hours of **8 a.m. and 6 p.m.** on the following days of the week:

☐ Sunday ☒ Monday ☒ Tuesday ☒ Wednesday ☒ Friday ☒ Saturday

Acceptable methods of payment: ☒ Personal Check ☒ Cashier's Check ☒ Money Order ☒ EFT/Credit (see owner/agent for details)

☐ There is a 24 hour drop box available at said location for your convenience.

If rent is not paid by the **THIRD** day of any calendar month, and/or if a check is tendered in payment of rent and thereafter is returned by the bank for any reason, a late charge by way of damages shall be immediately due and payable. Resident recognizes that default in fees and in loss to the Landlord of the use of the money due. Resident agrees that in the event of any such default, Landlord shall be entitled to damages for the detriment caused thereby. Since it is extremely difficult and impractical to ascertain the extent of such damages, Resident agrees that the sum of **$75.00** for each late rental payment which becomes delinquent and/or **$75.00** for each returned check, is a reasonable estimate of said damages, such agrees to pay said sum on demand. All rent is due in lawful money of the United States, without offset or deduction of any kind. Landlord will not send any notices or invoices. Timely payment is Resident's responsibility.

## SECTION 3: DEPOSITS.

A. Resident agrees to deposit with Landlord the additional sum of **$500.00** as security to be held by Landlord for the faithful performance by Resident of each and every provision of this Lease, which security Resident hereby authorizes Landlord to use for any one or more of the following purposes:
   1. If Resident vacates or abandons the Premises prior to the end of the Term, for daily rent equal to one-thirtieth (1/30th) of the Total Monthly Rent for each day rent is unpaid until the end of the term or until Landlord re-rents the Premises, whichever event is the first to occur;
   2. For repair of damages or destruction to the Premises, including furnishings and appliances, caused by Resident, exclusive or ordinary wear and tear;
   3. For the theft of fixtures, furnishings and/or appliances owned by Resident;
   4. For cleaning the Premises, if necessary, upon termination of the tenancy, including, but not limited to: any and all painting, including touch-up paint; filling wall holes caused by the hanging of pictures; and cleaning window coverings (which shall include without limitation, drapes, mini-blinds and the like), carpets, walls, doors, windows, refrigerator, range, oven and electrical fixtures;
   5. For payment of delinquent rent;
   6. For payment of any liquidated damages resulting from late rental payment and/or returned checks;
   7. For locks and keys in the event keys are not returned upon termination of the tenancy;
   8. For any amount charged under the provisions of paragraph C of Section 11.

   All sums payable to Landlord under the foregoing provisions shall be payable as additional rent for the Premises.
B. Within twenty-one (21) days after Resident vacates the Premises, Landlord will furnish the Resident with an itemized statement of the basis for, and the amount of the security received, and the disposition of such security, and shall return any remaining portion of such security to Resident, except as otherwise provided by paragraph C below, or shall bill Resident for amounts expended by Landlord, resulting in a deficiency in Resident's security account, which deficiency Resident agrees to pay Landlord forthwith upon receipt of such deficiency statement.
C. In the event Resident vacates or abandons the Premises prior to the end of the initial Term, or the month-to-month Term, and such Term has not expired and the Premises have not been re-rented within twenty one (21) days after Resident's vacation or abandonment, Landlord shall nonetheless furnish Resident with the above-described itemized statement within said twenty (21) day period, but shall retain the balance of said security until the end of such Term of the re-renting of the Premises, whichever event is first to occur, and shall return any remaining portion of such security to Resident, with an amended itemized statement within twenty one (21) working days thereafter.
D. The deposit or refund check, when issued under paragraph B or C above, will be made payable jointly in the name of each Resident who has executed this Lease Agreement, unless Landlord receives written instructions to the contrary executed by all such Residents, and shall be directed to Resident in the manner provided under paragraph C of Section 4.

## SECTION 4: EXPIRATION OF TERM; AUTOMATIC CONTINUATION OF LEASE ON MONTH TO MONTH TERM; NOTICE OF TERMINATION (NONDEFAULT).

A. A lease for a Term of a number of months expires at the end of the final month of that Term, as set forth herein. Any holding over, with the consent of the Landlord, shall automatically result in a month-to-month tenancy, upon the same terms and conditions as set forth herein.
B. If this Lease is, or is converted to, a month-to-month Term, the Lease may be terminated by either party giving the other party a written thirty (30) day notice of termination at any time.
C. Any notice or demand which Landlord may desire to serve upon Resident may be served upon Resident personally, or by leaving a copy with some person of suitable age and discretion at property or Resident's place of business, or by posting a copy at the Leased Premises, and also delivering a copy to a person there residing, if such person can be found; and also sending a copy through the mail addressed to the tenant at the place where the property is situated. Any notice or demand which Resident may desire to serve upon Landlord may be

TENANT:      LANDLORD:            1         🏠 OnSite!

**Exhibit A**

and also delivering a copy to a person there residing, if such person can be found; and also sending a copy through the mail addressed to the tenant at the place where the property is situated. Any notice of demand which Resident may desire to serve upon Landlord may be served personally or by U.S. Mail to Landlord's then Resident Manager for the Leased Premises.

**SECTION 5: RESIDENT'S COVENANTS AND WARRANTIES RELATING TO QUIET ENJOYMENT, WASTE, ANIMALS, WATERBEDS, AND NUISANCE; TERMINATION ON BREACH; NOTICE TO QUIT.**

A. Resident, individually, and for Resident's children, if any, invitees and visitors, covenants and warrants to Landlord, as follows:

1. The conduct of Resident and such others for whom Resident is responsible shall not, in any manner disturb the quiet enjoyment of other residents, their children, invitees, or visitors, in or near where the Premises are located, including the pool areas, recreation area and other common areas;

2. The conduct of Resident and such others for whom Resident is responsible shall not result in or cause destruction, damage or theft to the Premises, or any part thereof including, but not limited to, the pool, pool furniture and equipment, recreation room and recreation equipment, or the property of other residents, their children, invitees, and visitors;

3. Resident and such others for whom Resident is responsible shall not keep or maintain any animal on or about the Premises;

4. Resident and such others for whom Resident is responsible shall not keep or maintain any waterbed on or about the Premises without first providing Landlord with Resident's written binder of waterbed liability insurance and without obtaining written consent of Landlord. Notwithstanding Resident's waterbed insurance, Resident's shall be liable for all damage or destruction to Landlord's furnishing and appliances and other resident's furnishing and appliances caused by Resident's waterbed or other causes;

5. Resident and such others for whom Resident is responsible shall keep all balconies free of storage, laundry, and debris including without limitation all boxes, rugs, towels, bicycles, mopeds, large plants and the like;

6. Resident and such others for whom Resident is responsible shall not keep or maintain any abandoned or inoperable vehicles, vessels, bicycles or trailers in the parking lot on the Premises, or in the surrounding areas of the Premises;

7. Resident and such others for whom the Resident is responsible shall not maintain, commit, or permit the maintenance or commission of a nuisance, and shall not commit or permit the commission of waste upon the Premises or any part thereof.

   a. A nuisance shall be deemed committed by Resident if Resident, or such others for whom Resident is responsible, violate any of the provisions of subparagraph 1, 3, 4, 5, or 6 of this Section 5.

   b. Waste shall be deemed committed by Resident if Resident, or such others for whom Resident is responsible, violate any of the provisions of subparagraph 2 or 4 of this Section 5.

B. Resident acknowledges and agrees that any violation of covenants of this section which cause either a nuisance or waste, shall be deemed a non-curable default under the provisions of California Code of Civil Procedure § 1161, Part 4, and shall forthwith terminate this Lease Agreement.

C. In the event this Lease Agreement is terminated as described in Paragraph B of this Section 5, Landlord shall provide Resident with a notice in writing requiring Resident to quit and deliver possession of said Premises to Landlord within THREE DAYS after Resident's actual or constructive receipt of said notice. No reason need be stated by Landlord in said notice other than the statement that Resident has violated the provision of subparagraph 7 of paragraph A, Section 5 of this Lease Agreement.

**SECTION 6: DEFAULT; ABANDONMENT; ABANDONMENT OF PERSONAL PROPERTY.**

A. In the event of any breach of this Lease by Resident, then Landlord, besides any other rights or remedies Landlord may have, shall have the right to seek re-entry and to request removal of all persons and property from the Premises. If Resident breaches this Lease and abandons the Premises before the end of the Term, Landlord may enforce all his rights and remedies under the Lease, including the right to recover the rent as it becomes due under the Lease. Furthermore, if Resident breaches the Lease and abandons the property before the end of the Term or if Resident's right to possession is terminated by Landlord because of a breach of the Lease, then in either such case Landlord may recover from Resident all damages suffered by Landlord as the result of Resident's failure to perform Resident's Obligations hereunder, including the following:

1. The worth at the time of award of the unpaid rent which had been earned at the time of termination;

2. The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award Exceeds the amount of such rental loss that the Resident proves could have been reasonably avoided;

3. The worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Resident proves could be reasonably avoided; and

4. Any other amount necessary to compensate the Landlord for all the detriment proximately caused by the Resident's failure to perform his obligations or under the Lease or which in the ordinary course of things would be likely to result therefrom.

B. If Landlord's right of re-entry is exercised following abandonment of the Premises by Resident, then Landlord may consider any personal property belonging to Resident and left on the Premises to have been abandoned, in which case Landlord shall store such personal property for a period of five (5) days, and if not claimed by Resident during said five (5) day period may thereafter dispose of all such personal property if valued under $300.00. In any manner Landlord shall deem proper. Property valued in excess of $300.00, if not claimed by Resident within said five (5) day period shall be disposed of by public sale after notice of sale has been given by publication as provided by Civil Code § 1988.

C. Resident accepts Landlord's performance hereunder in lieu of the provisions of California Civil Code § 1983 relating to notice to Resident concerning personal property remaining on the Premises after termination of tenancy, which Code section provides that Resident is entitled to receive notice that the reasonable costs of storage may be charged before the property is returned; where the property may be claimed and the date before which the claim must be made, which is fifteen (15) days if notice is personally served, and eighteen (18) days if notice is by mail. In addition, Resident hereby acknowledges that this Lease was presented to Resident before Resident took possession of the Leased Premises and that Resident's waiver of the above-mentioned Civil Code § 1983 notice requirement is not ameliorated in effect or substance by California Civil Code § 1953.

**SECTION 7: ALTERATIONS.**

Resident shall not make any alteration to the Premises. In addition, Resident shall not attach foil, bed sheets or any other object to the windows or window coverings (which shall include without limitation, drapes, mini-blinds and the like) of the Leased Premises, nor shall Resident install or permit the installation of drapes or change entrance mats.

**SECTION 8: REPAIRS.**

A. Resident shall keep and maintain said Premises and every part thereof in good and sanitary condition, Resident agrees to pay for any repairs of the Premises due to Resident's negligence.

B. Resident agrees to immediately notify Landlord, in writing, should any plumbing, electrical, mechanical, or other equipment or part of the Premises become damaged, faulty or in disrepair.

C. Landlord provided Resident is not in violation of any of the affirmative obligation imposed upon Resident pursuant to California Civil Code § 1941.2 will, within a reasonable time after receipt of Resident's notice under paragraph B of Section 8, make such repairs to the Premises as are required.

**SECTION 9: ACCEPTANCE AND SURRENDER.**

Resident acknowledges having inspected the Premises and accepts said Premises herein as is, and as being in good and sanitary condition and repair and agrees, at the termination of this lease, to peaceably surrender same to Landlord in a clean and sanitary condition.

TENANT: _____ LANDLORD: _____                2

On-Site

The Parks at Monterey Bay

**PINNACLE**
An American Management Services Company

## SECTION 10: USE OF PREMISES.

A. Said Premises shall be used solely by Resident for residential purposes and shall be occupied only by the number of adults and children as set forth on page 1 of this Lease Agreement.

B. GUEST PROVISION: In the event Resident provides the Leased Premises to a guest it is agreed by the parties that such occupancy shall not extend for a period in excess of two weeks. Occupancy for a greater period shall be permitted with express written consent of the Landlord, which consent shall not be unreasonably withheld. Occupancy for periods in excess of fourteen (14) days shall be deemed a residency, for which Resident agrees to have said proposed resident provide a written application for residency and execute a lease agreement with Landlord/agent. Approval of said residency shall, at Landlord's sole discretion, occur on condition said proposed occupant fulfills credit and other criteria Landlord may designate upon review of said application. Failure to timely provide said application and lease agreement shall constitute a material breach of this agreement, entitling Landlord/agent to declare a forfeiture of said lease agreement. Any proposed residency shall be subject to state and local law governing occupancy limitations.

## SECTION 11: UTILITIES.

A. Resident shall comply with any city, municipal, county, state, special district, or Landlord's rules, regulations, ordinances or statutes now in force or which may be subsequently adopted or enacted relating to the use and conservation of all utilities including water. Landlord may enter the Premises pursuant to the provisions of Section 13, for the purpose of installing and ensuring the proper use of any ventilation system, including without limitation, the operation of air filters, water conservation devices, including without limitation, flow restriction and toilet water displacement equipment required by any regulatory authority or in Landlord's opinion necessary for the conservation of water. Resident shall verify, at all relevant times while he occupies the Premises, that the smoke alarm system, if any, is in good working order and shall immediately notify Landlord of any malfunctions upon Resident's discovery thereof.

B. Landlord shall not be required to furnish utilities and/or water to the Premises unless required to do so by California law. Landlord shall not be liable for damages resulting from the interruption of any utility service provided the Premises, including, but not limited to power outages.

C. In the event that a penalty, premium, excess use charge, or other based upon, or intended to mitigate against excess use shall be imposed in connection with the use of utilities and/or water by the project in which the Premises are located, Resident shall pay his pro rata share thereof as additional rent. In the event that such penalty or charge is not separately stated for apartment occupied by Resident, the penalty or other such charge shall be prorated in proportion that the square footage of the Premises bears to the entire square footage of all apartments in the project during the period for which it is imposed. Landlord shall notify Resident in writing of the amount thereof and Resident shall pay said amount at the time that his next installment of rent is due.

## SECTION 12: RESIDENT'S ACKNOWLEDGMENTS AND COVENANTS AND WARRANTIES RELATING TO USE AND OCCUPANCY OF THE PREMISES; TERMINATION ON BREACH.

A. Resident, individually, and for Resident's children, if any, invitees and visitors, acknowledges and covenants and warrants to Landlord as follows:

1. Resident hereby acknowledges that Landlord will not provide at any time a lifeguard or any other supervision for the pool, recreation room, area surrounding the pool and the driveway and parking areas for the Premises. Resident acknowledges that no person under the age of 16 is permitted to use the recreation room, the pool, jacuzzi, or surrounding areas unless such person is accompanied by Resident. Resident acknowledges that the pool and driveway areas of the Premises may constitute a threat and hazard to minors for whom Resident is responsible and Resident agrees to undertake to appropriately supervise such minors for whom Resident is responsible when such minors are present in the pool and driveway areas of the Premises;

2. Resident will not be permitted by Landlord to utilize the driveway, parking areas and hallways of the Premises for other than access purposes. Resident further agrees that neither Resident nor such others from whom Resident is responsible shall use bicycles or mopeds on the Premises and that any bicycles or mopeds when are a part of Resident's household shall be stored only in parking areas, if any, as provided in Section 17 of the Lease (regarding inoperable vehicles, vessels, bicycles or trailers, See Section 5, Paragraph A(8).);

3. Resident will not be permitted by Landlord to conduct, without limitation, maintenance, engine repair or body repair on vehicles, vessels, or trailers in the parking areas, if any, as provided in Section 17 of the Lease;

4. Resident agrees that neither Resident nor such others for whom Resident is responsible, shall use skateboards or roller skates at any time on the Premises, including the common areas, hallways, driveways or pool area;

5. Resident agrees that in the event Resident's apartment has a balcony, Resident shall preclude any minor child under the age of ten (10) for whom Resident is responsible, from occupying any portion of the balcony unless accompanied by Resident.

B. Resident acknowledges and agrees that the provisions of subparagraph 1 through 5 of this Section 12 are reasonable and necessary for the protection, good order, safety and/or cleanliness of the Premises, and/or for the general welfare of all of the residents who reside on the Premises, and a nuisance shall be deemed committed by Resident if Resident, or such others for whom Resident is responsible, violates any of said provisions.

C. Resident acknowledges and agrees that any violation of the covenants of Resident hereunder shall be deemed a non-curable default under the provisions of California Code Civil Procedure § 1161, Part 4, and shall forthwith terminate this Lease Agreement.

D. In the event this Lease Agreement is terminated as described in paragraph C of this Section 12, Landlord shall provide Resident with a notice in writing requiring Resident to quit and deliver possession of said Premises to Landlord within THREE DAYS after Resident's actual or constructive receipt of said notice. No reason need be stated by Landlord in said notice, other than the statement that Resident has violated the provisions under paragraph A, Section 12, of the Lease Agreement.

## SECTION 13: ENTRY BY LESSOR.

Resident agrees that Landlord and its agents may enter the premise in case of emergency or to make necessary or agreed repairs or improvements, or to make insurance inspections, or to exhibit the Premises to prospective or actual purchasers, mortgagees, tenants, workmen, or contractors, provided that such entry, other than in the case of emergency, be made during normal business hours, unless the Resident otherwise consents at the time of entry, and further provide that Landlord gives Resident twenty-four (24) hours notice of Landlord's intent to enter the Premises during normal business hours, other than in cases of emergency or if it is impracticable to do so.

## SECTION 14: ASSIGNMENT OR SUBLETTING.

Resident shall not assign this Lease or any interest therein, nor sublet said Premises or any part thereof without the prior written consent of Landlord, which shall not be unreasonably withheld, and any attempted assignment or sublet without written consent of the Landlord, shall be null and void.

## SECTION 15: WAIVER.

Any waiver by Landlord or any provision of this Lease shall be deemed a waiver of such provision or any subsequent breach of any provision, and the acceptance of rent thereunder shall not be deemed a waiver of any preceding breach by Resident of any provision of this Lease.

## SECTION 16: NON-LIABILITY OF OWNER FOR DAMAGES.

A. Landlord shall not be responsible for Resident's articles stored either on the Premises or in any part of the building; and any such storage shall be at Resident's sole risk nor shall Landlord be responsible for damage to Resident's personal property caused by water (whether from broken pipes or the weather), wind, fire, or vandalism, and Resident assumes the sole risk of loss resulting from such damage, except for damage resulting from the negligent acts or omission of the Landlord. Landlord encourages Resident to obtain his own renter's

TENANT: _____  LANDLORD: _____

3

On-Site

The Parks at Monterey Bay

PINN**A**CLE
An American Management Services Company

insurance for coverage of any damage that may be caused to Resident's personal property.

B.  Landlord shall not be responsible for any personal injury sustained by Resident on the Premises, including without limitation, the pool, jacuzzi, or hot tub, sauna, parking areas, fitness center (collectively referred to as "facilities") if any except for damage resulting from the negligent acts or omission of the Landlord Resident agrees that before he uses any of the facilities, he shall receive the appropriate physician's exam and permission and that Resident shall not misuse or excessively use the facilities that reasonably could cause personal injury to Resident.

**SECTION 17: PARKING.**

Unless otherwise provided in a parking addendum to this Lease Agreement, Landlord does not provide Resident with an assigned parking space for the Leased Premises. If assigned parking is provided, such parking may be altered, modified, or discontinued by Landlord upon thirty (30) days written notice to Resident. In the absence of assigned parking, Landlord, at its sole option, may adopt a parking arrangement for the Premises of which the Leased Premises are a part, modify such Agreement, and/or elect to assign parking spaces. Parking area is for vehicles used in daily transportation only.

**SECTION 18: ATTORNEY FEES AND CHARGES.**

In the event an attorney shall be employed, or an action be commenced, for the recovery of any rent or damages due under the provisions of this Lease, or for recovery of possession of said Premises, the prevailing party in such action shall be entitled to an award of reasonable attorney fees and all costs and expenses in connection with any such action.

**SECTION 19: JOINT AND SEVERAL LIABILITY.**

Each person executing this Lease as "Resident" is jointly and severally liable hereunder, and is required to perform in full all obligations imposed on Resident in this Lease.

**SECTION 20: INCORPORATING OF DOCUMENTS.**

By this reference, Resident's rental application, furniture inventory, inspection checklist, house rules (guidelines) and special supplements, if any, receipt of a copy of each is acknowledged by Resident, are incorporated herein and made part of this Lease Agreement.

**SECTION 21: CONSTRUCTION.**

It is agreed that if any provision of this Lease shall be determined to be void by any court of competent jurisdiction, then such determination shall not affect any other provisions of this Lease and all other provisions shall remain in full force and effect and it is the intention of the parties hereto that if any provision of this Lease is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, the provision shall have the meaning which renders it valid.

**SECTION 22: SATELLITE DISHES.**

Landlord will permit Resident to install a satellite dish for personal, private use on the Premises under the following conditions: 1. The satellite dish must be one meter or less in diameter; 2. The satellite dish may only be installed on the inside balcony, patio or terrace that is under the exclusive control of Resident. Said satellite dish, or any part thereof, shall not extend beyond the balcony, patio or terrace railing; 3. Resident is specifically prohibited from making physical modifications to the Premises and is prohibited from installing said satellite dish in the common areas of the Premises, including but not limited to, outside walls, roofs, windowsills, common balconies or stairways; 4. Resident shall not install said satellite dish in a manner which causes physical or structural damage to the Premises, excluding ordinary wear and tear, including but not limited to, holes drilled through exterior walls; tripods only; 5. Resident shall install, maintain and remove said satellite dish in a manner which is consistent with industry standards and shall be liable for any damage or injury sustained as a result of the negligent installation, maintenance or removal of said satellite dish; 6. Resident shall indemnify, defend and hold Landlord harmless for any damage or injury resulting from said negligence, including paying Landlord's attorneys fees and costs.

**SECTION 23: REGISTERED SEX OFFENDERS NOTICE.**

Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and the ZIP Code in which he or she resides.

**SECTION 24: PROPOSITION 65 NOTICE.**

Resident is hereby notified that his apartment/condominium project contains asbestos, a chemical known to the state of California to cause cancer, and other chemicals known to the state of California to cause cancer and/or birth defects and other reproductive harm. These hazardous substances are contained in some of the original building materials and in some of the products and materials used to maintain the property. Disturbance of/damage to certain interior apartment/condominium surfaces may increase the potential for exposure to these substances.

IN WITNESS WHEREOF, the undersigned have executed this Lease Agreement on the date first above written.

LANDLORD:

_(Agent for Owner)_     Date 3·1·07     Cheryl A. Adamski _(Resident)_     Date 3/1/07

Jason J. Adamski _(Resident)_     Date 3/1/07

**Acknowledgement and Receipt for Money Paid:**

Resident and Landlord hereby acknowledge below all money paid as of the date of signing this lease. Money paid:

Prior Deposit $ _____     First Month Rent $ _____     Security Deposit $ _____     Other Deposits $ _____
Credit Check $ _____     Parking/Carport Rent $ _____
Initials: TENANT: _____     LANDLORD: _____

4

On-Site

The Parks at Monterey Bay

PINNACLE
An American Management Services Company

## ADDENDUM A
## NOTICE OF INTENT TO VACATE PROCESS

**Procedure for Moving Out**

A written 30-day notice must be received by the appropriate Resident Services Office from the Resident. Notice to Vacate forms can be obtained from any Resident Services Office or the Welcome Center. All inspections are Monday-Friday from 8:30 am to 4:30 pm.

**Initial Inspection**    The initial inspection will provide the Resident and the Landlord/Agent with an understanding of what maintenance work may be expected upon move out. The original move-in form documenting the condition of the home at move-in will be used during the pre-inspection to ensure that noted deficiencies are not charged to the resident upon move-out. At the completion of the pre-inspection, the resident will be informed of any potential charges that may be assessed prior to move-out. Landlord may not be able to judge condition of cleanliness or flooring in the presence of Resident's possessions and Resident should refer to the cleaning guidelines for questions.

**Final Inspection**    The final inspection will be a walk-thru to verify correction of deficiencies noted at the time of pre-inspection. Deficiencies that have not been corrected may be charged to the Resident accordingly. Mailbox keys for existing homes must be returned to your local Post Office. Mailbox keys for new homes, defined as homes built in 2003 or newer, are returned to the appropriate Resident Services Office at the time of inspection. All keys must be given to the appropriate Resident Services Office at the time of final inspection to avoid possible charges. Final inspections will occur only when the home is clear of any and all personal items, as stated in the Cleaning Guidelines. If keys are surrendered prior to removal of all personal items, Landlord/Agent will consider any leftover items as waste, and will charge the Resident accordingly. Deficiencies in rent must be paid prior to final inspection. Please note that if a signed inspection report is not present in the resident file upon move-out, it will be assumed that there are no existing damages.

**Estimated Cleaning and Repair Charges**

If, prior to moving out, Resident does not clean Premises and leave them in the condition presented to them on move-in, the cost to repair and/or clean will be charged to the Resident, and is due in payable within 5 business days. Landlord/Agent reserves the right to forward the billing to a collection agency. Resident will be charged the actual cost of repairs; the following prices are estimates and guidelines only. If Landlord/Agent incurs a higher cost for replacing an item, the Resident will be responsible for paying the actual higher cost. If self-cleaning, a professional carpet shampoo will be required and a copy of the invoice must be submitted. Please note that this is not an all- inclusive list; the Resident may be charged for cleaning or repairing items that are not listed.

| General House Cleaning | | Carpet Cleaning | | Painting | | Floor Replacement |
|---|---|---|---|---|---|---|
| 2 bedroom | $180 | 2 bedroom | $150 | 2 bedroom | $610-$890 | Based on a 5-yr pro-rate |
| 3 bedroom | $270 | 3 bedroom | $200 | 3 bedroom | $760-$1020 | Carpet - $14.75/sq yd |
| 4 bedroom | $320 | 4 bedroom | $250 | 4 bedroom | $860-$1150 | Vinyl - $22.50/sq yd |

**Estimated Miscellaneous Charges**

If additional service is required or items missing or damaged to the point that they must be replaced when Resident moves out, Resident will be charged a pro-rated value for the current cost of replacement, including labor and service charges.

A representative list of replacement charges per item is provided below. Resident will be charged the actual final pro-rated cost of repair and replacements; the following prices are estimates only. If Landlord/Agent incurs a higher cost for replacing an item, the Resident will be responsible for paying the higher cost. Please note that this is not an all-inclusive list; Resident may be charged for the replacement of items that are not on the list.

| Item | Price | Item | Price | Item | Price |
|---|---|---|---|---|---|
| Accent wall sealant /wall | $50 | Pest Control | $50-$100 | Pet Sealant | $125 |
| Blind Wand | $6 | Garage Door | $500-$1000 | Refrigerator Shelves | $25-$40 |
| Blinds | $20-$75 | Garage Opener | $30 | Screens | $10-$45 |
| Broiler Pan Set | $35 | Garbage Disposal | $50 | Shower Doors | $150-$350 |
| Cabinet Door | $25 | Heater | $40 | Shower Rods | $5-$20 |
| Ceiling Fan | $75-$100 | Ice Trays | $2-$10 | Smoke/CO Detector | $32 |
| Counter Top Refinishing | $100-$200 | Keys | $5-$25 | Stove burner ring | $3 |
| Doors (int. & ext.) | $75-$300 | Light Bulbs | $2-$5 | Switch Plates | $2 |
| Drip Pan Rings | $2-$10 | Light Fixture | $75-$100 | Towel Rack | $10 |
| Faucet | $20 | Mirrors | $50-$350 | Verizon box | $300 |
| Fire Extinguisher | $50-$75 | Patio Glass Doors | $150-$600 | Window Glass | $60-$250 |

**Flea Free**    Residents with pets must present a veterinary certificate of flea prevention treatment dated no more than one month from date of move-out. Failure to provide appropriate documentation will result in charges for pest control.

**General Labor/Cleaning**    General cleaning and other services will be assessed at $35 per hour, including but not limited to labor for trash removal, washing of walls, doors, doorframes, switch plates, shelving, heat registers, sheet rock repair, removing contact paper, cork, mirrors, hooks, wallpaper, landscaping, and any other miscellaneous cleaning or repair services, other than that required to remedy damage caused by ordinary wear and tear. Rented appliances must be returned to the vendor, and will not be accepted by Landlord/Agent. Please refer to cleaning guidelines, distributed upon move-out and available at your local Resident Services office.



The Parks at Monterey Bay

PINNACLE
An American Management Services Company

**Note:**

Nothing herein shall be construed as a limitation upon Landlord's rights to pursue a claim for damages not specifically listed herein.

SIGNED BY:

**The Parks at Monterey Bay**

_____    3/1/07
Cheryl A. Adamski (Resident)        Date

_____    3-1-07
(Management)                Date

_____    3/1/07
Jason J. Adamski (Resident)         Date

6

The Parks at Monterey Bay

PINNACLE
An AmeriQus Management Services Company

# RENTAL AGREEMENT/LEASE AGREEMENT
## ADDENDUM PERTAINING TO ASBESTOS

POSTED IN ACCORDANCE WITH PROPOSITION 65,
CALIFORNIA HEALTH AND SAFETY CODE 25249.5 ET SEQ.

## WARNING

Resident is renting from Owner/Agent the premises located at <u>204 Salerno Rd., Seaside, CA 93955</u>.

This building **may** contain asbestos, a chemical known to the state of California to cause cancer.

1.  Resident(s) or their guests, employees and contractors shall not take or permit any action which in any way damages or disturbs the ceiling in the Premises or any part thereof, including without limitation: (i) piercing the surface of the ceiling by drilling or any other method; (ii) hanging plants, mobiles, or other objects from the ceiling; (iii) attaching any fixtures to the ceiling; (iv) allowing any objects to come in contact with the ceiling; (v) permitting water or any liquid, other than ordinary steam condensation, to come into contact with the ceiling; (vi) painting, cleaning, or undertaking any repairs of any portion of the ceiling; (vii) replacing light fixtures; (viii) undertaking any activity which results in building vibration which may cause damage to the ceiling.

2.  Resident(s) shall notify Owner and Agents immediately in writing: (i) if there is any damage to or deterioration of the ceiling in the Premises or any portion thereof, including without limitation flaking, loose, cracking, hanging or dislodged material, water leaks, or stains in the ceiling; or (ii) upon the occurrence of any of the events described in Paragraph 1 above.

3.  Resident(s) or their guests shall not use or keep in the Premises or cause to enter or remain in the Premises, any **dangerous substances**, including without limitation, materials identified as hazardous or toxic under any federal, state, or local laws or regulations and any other poisons, explosives, corrosive or radioactive materials.

4.  For safety, each person must run water faucets for at least two seconds to clear the faucet of standing water prior to use.

5.  This addendum is incorporated into and is a part of the Rental Agreement/Lease to which it is attached.

| | | | |
|---|---|---|---|
| Cheryl A. Adamski (Resident) | 3/1/07 Date | Jason J. Adamski (Resident) | 3/1/07 Date |
| (Owner/Agent) | 3-1-07 Date | | |

7

On-Site

**PINNACLE**
An American Management Services Company

# COMMUNITY CENTER GUIDELINES

The community center facilities are available exclusively to residents of The Parks at Monterey Bay. While using the facilities, please observe the following rules and regulations in order to maintain a safe and enjoyable environment for all residents. Community Center hours are from 0600 t0 2200 daily.

<u>Ballroom/Meeting Rooms/Billiards Room</u>

- Reservations may be made by any resident over the age of 18.
- The above-referenced rooms may be reserved by contacting the Welcome Center during business hours.
- The reservation deposit for any meeting room and the billiards room is $250. The ballroom can be reserved with a deposit of $900. Any incurred damages by Resident will be deducted from the deposit.
- The resident assumes all responsibilities for cleanliness, care of furnishings and for securing the building when leaving. Resident will be held liable for damages to the facility. While in possession of the Community Center key, the resident is responsible for all activities and actions of participants.
- A facility inspection will occur prior to the reservation date, and after keys have been returned to the office. Keys will not be distributed without a complete facility inspection. Weekend reservations must complete facility inspections on the Friday immediately preceding the event, and keys must be returned on the Monday immediately after the event.
- Alcohol is not permitted without written management consent, and must be served by a licensed vendor.
- The resident is responsible for returning the facility to its pre-event condition prior to the second facility inspection. Resident must provide any cleaning supplies needed, including but not limited to, trash bags, cleaning agents, and vacuums.

<u>Swimming and Wading Pools</u>

- Each resident over the age of 18 may bring up to 2 guests.
- Persons under the age of 16 must be supervised by capable swimmer over the age of 18.
- Wading pools are for patrons under the age of 7.
- No diving, jumping, intentional falling, or rough play inside or around pools.
- Food, drinks and glass of any type are not allowed in pool area.
- Abusive or profane language is prohibited.
- No smoking or spitting.
- Radios, CD players, and other electronic devices are permitted for use only with personal headphones.
- Animals, other than service animals (proof of status of the service animal must be shown prior to entering the facility) are not permitted in the pool area.
- Proper pool attire must be worn inside pool.
- Infants and toddlers in diapers must wear swim diapers in the pools at all times.
- Toys and other play items are prohibited.
- Any items or activities that create a hazard to patrons, staff, or the facility are prohibited.
- A hydraulic pool lift is available. Please ask a staff member for assistance.
- Reasonable modification requests for assistance or use of flotation devices may be submitted to the staff upon each visit to the pool.

<u>Play Center</u>

- Persons under the age of 10 must be accompanied by a person over the age of 18.

<u>Fitness Centers: Weight and Cardio Rooms</u>

- Appropriate attire and footwear must be worn.
- Clothing bearing inappropriate messages is prohibited.
- Personal items are to be stored in the locker rooms during use of the fitness centers.
- No persons under the age of 16 are permitted in the fitness centers.
- Smoking, eating, and spitting in the fitness centers is strictly prohibited.
- Towels or rags are required during use of the equipment. Please wipe equipment and controls after use.
- Animals, other than service animals (proof of status of the service animal must be shown prior to entering the facility) are not permitted in the fitness centers.
- Please replace all equipment to their original location.
- Warm up and cool down periods are strongly recommended to help prevent injury.
- Please report any and all equipment issues and injuries to the staff immediately.

*The Parks at Monterey Bay, American Management Services LLC, Clark Realty, Pinnacle, and all other entities involved in the management of this community are not liable for loss, theft, or damage of persons or property. Patrons use this facility at their own risk. The above rules and regulations must be observed at all times while on the premises. Failure to do so will result in loss of privileges to the Community Center and the amenities offered. Management and staff reserve the right to restrict use of the complex and its facilities at any time for any duration. The undersigned understand and agree to the rules and regulations as listed above.*

Cheryl A. Adamski (Resident)        Date: 3/1/07        Jason J. Adamski (Resident)        Date: 3/1/07

(Owner/Agent)        Date: 3-1-0

8

# CRIME FREE/DRUG FREE HOUSING ADDENDUM

Apartment Community: <u>The Parks at Monterey Bay</u>
Apartment Address: <u>204 Salerno Rd., Seaside, CA 93955</u>
Resident Name(s): <u>Cheryl A. Adamski and Jason J. Adamski</u>

In consideration of the execution or renewal of a lease/rental agreement of the dwelling unit identified in the lease/rental agreement, Owner and Resident agree as follows:

1.  Resident, any members of the Resident's household, or a guest or other person under the Resident's control shall not engage in criminal activity, including drug-related criminal activity, on or near the said premises. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance Act (21 U.S.C. 802)).

2.  Resident, any member of the Resident's household or a guest or other person under the Resident's control <u>shall not engage in any act intended to facilitate criminal activity, including drug-related criminal activity,</u> on or near the said premises.

3.  Resident or members of the household <u>will not permit the dwelling unit to be used for, or to facilitate criminal activity,</u> including drug-related criminal activity, regardless of whether the individual engaging in such activity is a member of the household, or a guest.

4.  Resident or members of the household will not engage in the manufacture, sale or distribution of illegal drugs at any location, whether on or near the dwelling unit premises or otherwise.

5.  Resident, any member or the Resident's household, or a guest or another person under the Resident's control shall not engage in acts of violence or threats of violence, including, but not limited to the unlawful discharge of firearms on or near property premises.

6.  <u>VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE LEASE/RENTAL AGREEMENT AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY.</u> A <u>single</u> violation of any of the provisions of this added addendum shall be deemed a serious violation and a material and irreparable non-compliance. It is understood that a <u>single</u> violation shall be good cause for <u>termination of the lease/rental agreement.</u> Unless otherwise provided by law, proof of violation <u>shall not require criminal conviction,</u> but shall be by a preponderance of the evidence.

7.  In case of conflict between the provisions of this addendum and any other provisions of the lease/rental agreement, the provisions of the addendum shall govern.

8.  This LEASE/RENTAL ADDENDUM is incorporated into the lease/rental agreement executed or renewed this day between Management and Resident.

| | |
|---|---|
| _(signature)_ | _(signature)_    3/1/07 |
| Cheryl A. Adamski (Resident)    Date | Jason J. Adamski (Resident)    Date |
| _(signature)_    3-1-0_ | |
| (Owner/Agent)    Date | |

9

On-Site

The Parks at Monterey Bay

PINNACLE
An American Management Services Company

# FACTS ABOUT RENTERS INSURANCE

Apartment Community: <u>The Parks at Monterey Bay</u>
Apartment Address: <u>204 Salerno Rd., Seaside, CA  93955</u>
Resident Name(s): <u>Cheryl A. Adamski and Jason J. Adamski</u>

The purpose of this letter is to inform you concerning insurance coverage so that you can protect yourself against loss and to help prevent any misunderstanding about the owner's insurance coverage. It is not an effort by the Owner/Agent to change responsibilities that is done by the state legislature and the courts.

1. THE OWNER IS NOT legally responsible for loss to the Resident's personal property, possessions or personal liability, and OWNER'S INSURANCE WILL NOT COVER such losses or damages.

2. The owner's insurance company may have the right to attempt (under the "subrogation clause") to recover from the Resident's payments made under owner's policy for damages or injury to owners property that is caused by Resident, Resident's guest(s) or dependent(s).

3. The following is a list of possible misfortunes (but not limited to) you could be held legally responsible for:

   a. Your babysitter injures herself in your apartment.

   b. Your defective electrical extension cord starts a fire, which causes damage to the building and/or the personal property of others.

   c. A friend is injured while helping you slide out your refrigerator so you can clean behind it.

   d. While fixing your television set, a repair person hired by you is injured when they slip on the floor you have just waxed.

   e. Your locked car is broken into and you personal property, and that of a friend's, is stolen.

   f. A burglar breaks your front door lock and steals your valuables or personal property.

   g. Damages resulting from a waterbed leak.

4. If you desire to protect yourself and your property against loss, damage, or liability, the owner strongly recommends you consult with your insurance agent and obtain appropriate coverage for fire, theft, liability, workers' compensation and other perils.

_____   3/1/07        _____   3/1/07
Cheryl A. Adamski (Resident)       Date         Jason J. Adamski (Resident)       Date

_____   3-1-07
(Agent)                           Date

On-Site

The Parks at Monterey Bay

PINNACLE
An American Management Services Company

## GUEST AND OPEN PARKING

Resident: <u>Cheryl A. Adamski and Jason J. Adamski</u>
Unit #: <u>204</u>

All vehicles parked in "Guest Parking" or "Open Parking" spaces are only allowed to park in the same spot for 24 hours. Otherwise, the vehicle will be towed away at the owner's expense. Inoperable and/or dead storage of vehicles is prohibited and will be towed away, also at the owner's expense. All other issues on this subject please refer to Community Policies #4.

_____    3/1/07        _____    3/1/07
Cheryl A. Adamski (Resident)       Date      Jason J. Adamski (Resident)       Date

11

On-Site

PINNACLE
An America Management Services Company

# IN CASE OF EMERGENCY

Apartment Community: <u>The Parks at Monterey Bay</u>
Apartment Address: <u>204 Salerno Rd., Seaside, CA  93955</u>
Resident Name(s): <u>Cheryl A. Adamski and Jason J. Adamski</u>

Dear Resident: We at <u>The Parks at Monterey Bay</u> are extremely happy to have you as a Resident. We hope that your home is as comfortable as it can possibly be. However, we know that situations can arise that are beyond anyone's control. The following are considered emergencies and emergency number that **you should keep handy.**

**FOR AFTER HOURS EMERGENCIES CALL:**

·   Electrical - Any major electrical problem or power outage.

·   Oven/Refrigerator - If appliance is <u>completely</u> out.

·   No Water/Water Leaks - Any water leak that is causing or may cause structural damage. (Does not include leaky faucets.)

·   Sewers - Any major sewer backup or toilet stoppage in a unit with one bathroom.

·   Resident lockouts - <u>**$0.00**</u> after office hours.

·   Window replacement or entrance doors - When security factors are involved.

·   No A/C or heat - If temperatures or health factors make it necessary.

**FIRE DEPARTMENT**

·   Emergency - **call 911**, non-emergency call .

**POLICE DEPARTMENT**

·   Emergency - **call 911**, non-emergency call .

In case of crime or fire, after notifying the local law enforcement authorities, you should then notify our office at <u>(831) 644-0400</u>.

We at <u>The Parks at Monterey Bay</u> care about each of our Residents, however, you can appreciate, <u>no one</u> can guarantee your safety. The best safety measures you can take are the ones you yourself perform as a matter of common sense and habit. Please remember that your security is the responsibility of yourself and the local law enforcement agencies.

| | | |
|---|---|---|
| Cheryl A. Adamski (Resident) | Date  3/1/07 | Jason J. Adamski (Resident) | Date  3/1/07 |
| (Owner/Agent) | Date  3-1-07 | | |

On-Site

PINNACLE
An American Management Services Company

## KEY ACCEPTANCE

Apartment Community: <u>The Parks at Monterey Bay</u>
Apartment Address: <u>204 Salerno Rd., Seaside, CA  93955</u>
Resident Name(s): <u>Cheryl A. Adamski and Jason J. Adamski</u>

| # Received | Key Type | Replacement Cost Per Key |
|---|---|---|
| | Door Entry | $25.00 |
| | Mailbox | $25.00 |
| | Pool | $25.00 |
| | Laundry Room | $25.00 |
| | Exercise Room | $25.00 |
| | Bathrooms | $25.00 |
| | Common Areas | $25.00 |

I/We understand that all keys assigned to my/our apartment are to be returned at Move-Out, and failure to do so will indicate that I/We are in possession of apartment. Rent will be charged until all keys are turned in.

Lost keys are billed as listed above. Lock changes are to be done by **The Parks at Monterey Bay** only, and charged to the Resident.

Door Entry $25.00

Mailbox $25.00

Pool $25.00

Laundry Room $25.00

Exercise Room $25.00

Bathrooms $25.00

Common Areas $25.00

Cheryl A. Adamski (Resident)        Date  3/1/07        Jason J. Adamski (Resident)        Date  3/1/07

(Owner/Agent)        Date  3-1-07

Initials        Initials

13

On-Site!

The Parks at Monterey Bay

PINNACLE
An AmeriVest Management Services Company

# FEDERALLY REQUIRED LESSOR DISCLOSURE, AGENT STATEMENT AND LESSEE ACKNOWLEDGMENT OF INFORMATION ON LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS

Resident is renting from Owner/Agent the premises located at <u>204 Salerno Rd., Seaside, CA  93955</u>.

**LEAD WARNING STATEMENT**

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not taken care of properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, landlords must disclose the presence of known lead-based paint and lead-based paint hazards in the dwelling. Tenants must also receive a Federally approved pamphlet on lead poisoning prevention. **NOTE: The existence of lead on the rental property is not, by itself, cause for termination of the tenancy. (Public Law 102-550 sec. 1018(c))**

**OWNER'S DISCLOSURE**

1.  Presence of lead-based paint or lead-based paint hazards:

    ☒ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

    ❑ Known lead-based paint and/or lead-based paint hazards are present in the housing.

2.  Records and reports available to the Lessor:

    ☒ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

    ❑ Lessor has provided the Resident with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**ACCURACY CERTIFICATION AND RESIDENT'S ACKNOWLEDGMENT**

Owner and any agent named below certify that to the best of their knowledge the above information and statements made or provided respectively, are true and accurate. The person who signs for the **LESSOR** may be: (1) the owner himself or herself; (2) employee, officer or partner to the owner; or (3) a representative of the owner's management company, real estate agent or locator service if such person is authorized to sign for the lessor. The person who signs for **AGENT** may be: (1) the owner himself or herself; (2) an employee, officer or partner of the agent if such a person is authorized to sign for the agent. The lessees (residents) signing below acknowledge that they have received a copy of this lease addendum and been informed that it contains the disclosure form and information required by federal law regarding lead poisoning prevention.

| | | |
|---|---|---|
| _Cheryl A. Adams_ | 3/1/07 | _Jason J. Adams_      3/1/07 |
| Cheryl A. Adams *(Lessee/Resident)* | Date | Jason J. Adams *(Lessee/Resident)*      Date |
| | | 3-1-07 |
| (Name of LESSOR/Owner for the dwelling) | Date | (Name Agent of AGENT for lessor (i.e. management      Date company, real estate agent or locator service involved in leasing the dwelling) |
| (Signature of person signing on behalf of above LESSOR) | Date | (Signature of person signing on behalf of above AGENT) Date |



The Parks at Monterey Bay

PINNACLE
An Americas Management Services Company

# MANAGEMENT'S AUTHORIZATION TO ADMIT

Resident(s): <u>Cheryl A. Adamski and Jason J. Adamski</u>

Date: <u>March 1, 2007</u>
Apt. No. <u>204</u>

I/We the Resident(s) at **The Parks at Monterey Bay** authorize the **The Parks at Monterey Bay** Management to admit the following person(s) to my/our home.

| NAME | RELATIONSHIP |
|---|---|
| David Kretzmann | Father |
| Jane Kretzmann | Step Mother |
| | |
| | |

I/We understand that this authorization is effective until such time as I/We terminate authorization in writing to the The Parks at Monterey Bay Office.

I/We agree and assume all risks in connection with the admittance I/We authorize and hold The Parks at Monterey Bay harmless.

Cheryl A. Adamski (Resident)          Date: 3/1/07

(Owner/Agent)          Date: 3-1-07

Jason J. Adamski (Resident)          Date: 3/1/07

On-Site

The Parks at Monterey Bay

PINNACLE
An American Management Services Company

## ADDENDUM TO RENTAL AGREEMENT

**Registered Sex Offenders Notice:**    Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and the ZIP Code in which he or she resides.

_____    3/1/07    _____    3/1/07
Cheryl A. Adamski *(Resident)*    Date    Jason J. Adamski *(Resident)*    Date

_____    3-1-07
*(Resident Manager)*    Date

16

On-Site

# MOLD AND MILDEW ADDENDUM

This Mold and Mildew Addendum (the "Addendum") dated <u>MARCH 1, 2007</u> is attached to and made a part of the lease/rental agreement dated <u>MARCH 1, 2007</u> (the "Lease") by and between <u>The Parks at Monterey Bay</u>, as agent for owner of the Apartments ("Lessor"), and <u>Cheryl A. Adamski and Jason J. Adamski</u> ("Resident") for apartment number <u>204</u> (the "Unit") in <u>The Parks at Monterey Bay</u> (the "Apartments").

Resident acknowledges that it is necessary for Resident to provide appropriate climate control, keep the Unit clean, and take other measures to retard and prevent mold and mildew from accumulating in the Unit. Resident agrees to clean and dust the Unit on a regular basis and to remove visible moisture accumulation on windows, walls and other surfaces as soon as reasonably possible. Resident agrees not to block or cover any of the heating, ventilation or air-conditioning ducts in the Unit. Resident also agrees to immediately report to the management office: (i) any evidence of a water leak or excessive moisture in the Unit, as well as in any storage room, garage or other common area; (ii) any evidence of mold- or mildew-like growth that cannot be removed by simply applying a common household cleaner and wiping the area; (iii) any failure or malfunction in the heating, ventilation or air conditioning system in the Unit; and (iv) any inoperable doors or windows. Resident further agrees that Resident shall be responsible for damage to the Unit and Resident's property as well as personal injury to Resident and occupants resulting from Resident's failure to comply with the terms of this Addendum.

A default under the terms of this Addendum shall be deemed a material default under the terms of the Lease/Rental Agreement, and Lessor shall be entitled to exercise all rights and remedies at law or in equity. Except as specifically stated herein, all other terms and conditions of the Lease/Rental Agreement shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease/Rental Agreement, the terms of this Addendum shall control. Any term that is capitalized but not defined in this Addendum that is capitalized and defined in the Lease/Rental Agreement shall have the same meaning for purposes of this Addendum as it has purposes of the Lease/Rental Agreement.

Resident acknowledges receiving a copy of the property approved tip sheet for the prevention of mold growth in apartment homes.

| | | | |
|---|---|---|---|
| Cheryl A. Adamski (Resident) | 3/1/07 Date | Jason J. Adamski (Resident) | 3/1/07 Date |
| (Owner/Agent) | 3-1-07 Date | | |

Apartment Number: <u>204</u>

17

On-Site

The Parks at Monterey Bay

**PINNACLE**
An American Management Services Company

# TIP SHEET ON MOLD

It is our goal to maintain the highest quality living environment for our Residents. To help achieve this goal, it is important to work together to minimize the potential for conditions that could lead to the growth of naturally occurring mold.

## <u>Tips for Residents:</u>

**Resident can help minimize mold growth in their apartment homes by taking the following actions:**

- Open windows. Proper ventilation is essential. If it is not possible to open windows, run the fan on the apartment air-handling unit to circulate fresh air throughout your apartment.

- In damp or rainy weather conditions, keep windows and doors closed.

- If possible, maintain a temperature of between 50 and 80 degrees Fahrenheit within your apartment at all times.

- Clean and dust your apartment on a regular basis as required by your lease/rental agreement. Regular vacuuming, mopping, and use of environmentally safe household cleaners is important to remove household dirt and debris that contribute to mold growth.

- Periodically clean and dry the walls and floors around the sink, bathtub, shower, toilets, windows and patio doors using a common household disinfecting cleaner.

- On a regular basis, wipe down and dry areas where moisture sometimes accumulates, like countertops, windows, windowsills, bathroom sinks, toilets, and shower enclosures.

- Use the pre-installed bathroom fan or alternative ventilation when bathing or showering and allow the fan to run until all excess moisture has vented from the bathroom.

- Use the exhaust fans in your kitchen when cooking or while the dishwasher is running and allow the fan to run until all excess moisture has vented from the kitchen.

- Use care when watering houseplants. If spills occur, dry up excess water immediately.

- Ensure that your clothes dryer vent is operating properly, and clean the lint screen after every use.

- When washing clothes in warm or hot water, watch to make sure condensation does not build up within the washer and dryer closet; if condensation does accumulate, dry with a fan or towel.

- Thoroughly dry any spills or pet urine on carpeting.

- Do not overfill closets or storage areas. Ventilation is important in these spaces.

- Do not allow damp or moist stacks of clothes or other cloth materials to lie in piles for an extended period of time.

- Immediately report to the management office any evidence of a water leak or excessive moisture in your apartment, storage room, garage, or any common area.

- Immediately report to the management office any evidence of mold growth that cannot be removed by simply applying a common household cleaner and wiping the area. Also report any area of mold that reappears despite regular cleaning.

- Immediately report to the management office any failure or malfunction with your heating, ventilation or air-conditioning ducts in your apartment.

- Immediately report to the management office any inoperable windows or doors.

- Immediately report to the management office any musty odors that you notice in your apartment.



The Parks at Monterey Bay

PINNACLE
An American Management Services Company

# MOVE-IN/MOVE-OUT REPORT

Address: #204 Salerno Rd., Seaside, CA  93955
Resident(s): Cheryl A. Adamski and Jason J. Adamski
Move-In Date: February 26, 2007

| ITEM | MOVE-IN CONDITION Apartment clean without damage unless otherwise noted below | | MOVE-OUT CONDITION | | CHARGES | |
|---|---|---|---|---|---|---|
| Floors | | | | | $ 6.00 | |
| KITCHEN | Accep | Unaccep | Accep | Unaccep | (circle) | |
| Walls | | | | | $ 15.00 | |
| Cabinets | | | | | $ 6.00 | |
| Range Top/Oven/Broiler Pan | | | | | $ 20.00 | |
| Hood, Filter fan | | | | | $ 5.00 | |
| Refrigerator | | | | | $ 10.00 | |
| Dishwasher | | | | | $ 5.00 | |
| Lights | | | | | $ 2.00 | |
| Sink & Counters | | | | | $ 5.00 | |
| Windows/Tracks/Screens/Blinds | | | | | $ 5.00 | |
| Microwave | | | | | $ - | |
| LIVING ROOM, DINING AREA & HALLWAYS | | | | | | |
| Lights | | | | | $ 5.00 | |
| Carpets Condition | | | | | $ - | |
| Walls | | | | | $ 15.00 | |
| Windows/Tracks/Screens/Blinds/Drapery | | | | | $ 5.00 | |
| Washer/Dryer | | | | | $ 10.00 | |
| Fireplace | | | | | $ 10.00 | |

| BATHROOMS #1 | MOVE-IN CONDITION | | | | | | MOVE-OUT CONDITION | | | | | | CHARGES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | #1 | | #2 | | #3 | | #1 | | #2 | | #3 | | |
| | Accep | Unacc | Accep | Unacc | Accep | Unacc | Accep | Unacc | Accep | Unacc | Accep | Unacc | |
| Floor | | | | | | | | | | | | | $ 6.00 |
| Walls | | | | | | | | | | | | | $ 15.00 |
| Sink & Vanity | | | | | | | | | | | | | $ 5.00 |
| Tub/Shower | | | | | | | | | | | | | $ 5.00 |
| Lights | | | | | | | | | | | | | $ 2.00 |
| Toilets | | | | | | | | | | | | | $ 5.00 |
| Cabinets | | | | | | | | | | | | | $ 5.00 |
| Windows/Tracks/ Screens/Blinds | | | | | | | | | | | | | $ 5.00 |
| BEDROOMS #2 | | | | | | | | | | | | | |
| Lights | | | | | | | | | | | | | $ 2.00 |
| Carpet Condition | | | | | | | | | | | | | $ - |
| Walls | | | | | | | | | | | | | $ 15.00 |
| Windows/Tracks/ Screens/Blinds | | | | | | | | | | | | | $ 5.00 |
| Closets/Doors | | | | | | | | | | | | | $ - |
| Resident Initials: | | | | | | | | | | | | | TOTAL (A) |

Comments:

| Smoke Detector Operational | Names: Cheryl A. Adamski and Jason J. Adamski |
|---|---|
| ☐ Yes ☐ No | Forwarding Address: _____ |
| | Date of Occupancy: February 26, 2007 Date Vacated: _____ |
| | Rental Term (# Months): ____ Rental Expiration Date: _____ |
| _____ | Proper Notice Given: ☐ Yes ☐ No  Breaking Lease: ☐ Yes ☐ No |
| _____ | Eviction: ☐ Yes ☐ No  Skip: ☐ Yes ☐ No |
| Resident Signatures | Monthly Rent: _____ |

On-Site

The Parks at Monterey Bay

PINNACLE
An Anchinton Management Services Company

## MOVE-IN/MOVE-OUT REPORT (PAGE 2)

Address: #204 Salerno Rd., Seaside, CA 93955
Resident(s): Cheryl A. Adamski and Jason J. Adamski
Move-In Date: February 26, 2007

| CREDITS | | |
|---|---|---|
| Refundable Security Deposit | $ _____ | |
| Non-refundable fee | $ _____ | |
| Miscellaneous deposit (for keys, door openers, etc.) | $ _____ | |
| Rent refund (if any) (Dates From _____ to _____) | $ _____ | |
| Pet Deposit | $ _____ | |
| TOTAL CREDITS | | $ _____ |
| **CHARGES** | | |
| TOTAL (A) | $ _____ | |
| Drapes/Blinds | | |
| Cleaned Yes ☐ No ☐ / Cleaned By _____ | $ _____ | |
| Carpets | | |
| Cleaned Yes ☐ No ☐ / Cleaned By _____ | $ _____ | |
| Replace Yes ☐ No ☐ | | |
| Paint | | |
| Yes ☐ No ☐ | $ _____ | |
| Touch-up 1/2 ☐ Full ☐ | | |
| Major Repairs (Detail) | | |
| _____ | $ _____ | |
| _____ | $ _____ | |
| _____ | $ _____ | |
| _____ | $ _____ | |
| _____ | $ _____ | |
| Keys Replaces Number _____ | $ _____ | |
| Locks Changed Number _____ | $ _____ | |
| Rent Due Per Rental Agreement | $ _____ | |
| Penalty Fee | | |
| TOTAL CHARGES | $ _____ | |
| TOTAL CREDITS LESS TOTAL CHARGES | | $ _____ |
| REFUNDABLE DEPOSIT FORFEITED | | $ _____ |
| BALANCE DUE FROM RESIDENT | $ _____ | |
| AMOUNT OF RESIDENT REFUND | $ _____ | |

| OFFICE USE | |
|---|---|
| Property Manager Approval: _____ | Date Received: _____ |
| Ck #: | Date Mailed: _____ |

I have inspected the above apartment prior to occupancy and accept it with the conditions noted.
I understand further that upon vacating the above unit, any cleaning required will be charged at the rates listed. Repair and replacement costs resulting from tenant negligence will also be added.

| Owner/Agent | | | Date |
|---|---|---|---|
| Resident Signature (on move-in) | Date | Resident Signature (on move-in) | Date |
| Owner/Agent | | | Date |
| Resident Signature (on move-out) | Date | Resident Signature (on move-out) | Date |

On-Site

The Parks at Monterey Bay

PINNACLE
An American Management Services Company

## MOVE-IN/MOVE-OUT REPORT

| Resident Name(s) | | | Initial Inspection Date | | Initial Inspection By | | Final Inspection Date | Final Inspection By |
|---|---|---|---|---|---|---|---|---|
| Cheryl A. Adamski and Jason J. Adamski | | | | | | | | |
| Address | | | City | | State | Zip | Move In Date | Move Out Date |
| 204 Salerno Rd. | | | Seaside | | CA | 93955 | February 28, 2007 | |

**Codes**

| | | |
|---|---|---|
| ND - No Damage | NCC - Needs complete cleaning | REP - Replace | SC - Needs spot cleaning |
| SP - Needs spot painting | RPR - Needs repair | PT - Needs painting | SCR - Scratched |

| KITCHEN | Move-In Inspection | Initial Inspection | Final Inspection | Estimated Cost | | 1st BATH | Move-In Inspection | Initial Inspection | Final Inspection | Estimated Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| Ceiling | | | | | | Ceiling | | | | |
| Doors | | | | | | Walls/Tile | | | | |
| Walls | | | | | | Floors | | | | |
| Floors | | | | | | Cabinets | | | | |
| Hood/Filter | | | | | | Shelves | | | | |
| Fan/Light | | | | | | Doors | | | | |
| Counter | | | | | | Mirror | | | | |
| Faucet | | | | | | Tub/Shower | | | | |
| Drains | | | | | | Caulking | | | | |
| Cabinets | | | | | | Shower Rod | | | | |
| Shelves | | | | | | Basin | | | | |
| Under sink | | | | | | Drains | | | | |
| Windows | | | | | | Faucets | | | | |
| Screens | | | | | | Counter tops | | | | |
| Blinds | | | | | | Exhaust fan | | | | |
| Elec. Fixture | | | | | | Bowl/Seat | | | | |
| Light bulbs | | | | | | Towel racks | | | | |
| Window | | | | | | Window | | | | |
| Screen | | | | | | Screen | | | | |
| | | | | | | Elec fixtures | | | | |
| STOVE/OVEN | | | | | | Light bulbs | | | | |
| Stove surfaces | | | | | | | | | | |
| Burners | | | | | | 2nd BATH | | | | |
| Drip pans | | | | | | Ceiling | | | | |
| Vent | | | | | | Walls/Tile | | | | |
| Timer/Controls | | | | | | Floors | | | | |
| Oven surfaces | | | | | | Cabinets | | | | |
| Oven racks | | | | | | Shelves | | | | |
| Broiler pan | | | | | | Doors | | | | |
| Light | | | | | | Mirror | | | | |
| | | | | | | Tub/Shower | | | | |
| REFRIGERATOR | | | | | | Caulking | | | | |
| Inside | | | | | | Shower Rod | | | | |
| Outside | | | | | | Basin | | | | |
| | | | | | | Drains | | | | |
| DISHWASHER | | | | | | Faucets | | | | |
| Inside | | | | | | Counter tops | | | | |
| Outside | | | | | | Exhaust fan | | | | |
| | | | | | | Bowl/Seat | | | | |
| LIVING ROOM | | | | | | Towel racks | | | | |
| Walls | | | | | | Window | | | | |
| Ceiling | | | | | | Screen | | | | |
| Doors | | | | | | Elec fixtures | | | | |
| Windows | | | | | | Light bulbs | | | | |
| Screens | | | | | | | | | | |
| Drapes/Blinds | | | | | | DINING ROOM | | | | |
| Shades/____ | | | | | | Walls | | | | |
| Floor | | | | | | Ceiling | | | | |
| Closet | | | | | | Drapes/Blinds | | | | |
| Elec bulbs | | | | | | Shades/____ | | | | |
| Light bulbs | | | | | | Doors | | | | |
| Fireplace | | | | | | Floor | | | | |
| | | | | | | Windows | | | | |
| | | | | | | Screens | | | | |
| | | | | | | Elec fixtures | | | | |
| | | | | | | Light bulbs | | | | |

On-Site

The Parks at Monterey Bay

**PINNACLE**
An AIMCO/Riverstone Management Services Company

| 2nd BDRM | Move-In Inspection | Initial Inspection | Final Inspection | Estimate Cost |
|---|---|---|---|---|
| Walls | | | | |
| Ceiling | | | | |
| Windows | | | | |
| Screens | | | | |
| Drapes/Blinds | | | | |
| Shades/____ | | | | |
| Doors | | | | |
| Closet | | | | |
| Floor | | | | |
| Elec fixture | | | | |
| Light bulbs | | | | |

| 3rd BDRM | | | | |
|---|---|---|---|---|
| Walls | | | | |
| Ceiling | | | | |
| Windows | | | | |
| Screens | | | | |
| Drapes/Blinds | | | | |
| Shades/____ | | | | |
| Doors | | | | |
| Closet | | | | |
| Floor | | | | |
| Elec fixture | | | | |
| Light bulbs | | | | |

| 4th BDRM | | | | |
|---|---|---|---|---|
| Walls | | | | |
| Ceiling | | | | |
| Windows | | | | |
| Screens | | | | |
| Drapes/Blinds | | | | |
| Shades/____ | | | | |
| Doors | | | | |
| Closet | | | | |
| Floor | | | | |
| Elec fixture | | | | |
| Light bulbs | | | | |

| HALL/STAIRS | | | | |
|---|---|---|---|---|
| Walls | | | | |
| Ceiling | | | | |
| Windows | | | | |
| Screens | | | | |
| Drapes/Blinds | | | | |
| Shades/____ | | | | |
| Doors | | | | |
| Closet | | | | |
| Floor | | | | |
| Elec fixture | | | | |
| Light bulbs | | | | |

| 5th BDRM | | | | |
|---|---|---|---|---|
| Walls | | | | |
| Ceiling | | | | |
| Windows | | | | |
| Screens | | | | |
| Drapes/Blinds | | | | |
| Shades/____ | | | | |
| Doors | | | | |
| Closet | | | | |
| Floor | | | | |
| Elec fixture | | | | |
| Light bulbs | | | | |

| HALL/ENTRY | Move-In Inspection | Initial Inspection | Final Inspection | Estimate Cost |
|---|---|---|---|---|
| Walls | | | | |
| Ceiling | | | | |
| Windows | | | | |
| Screens | | | | |
| Drapes/Blinds | | | | |
| Shades/____ | | | | |
| Doors | | | | |
| Closet | | | | |
| Floor | | | | |
| Elec fixture | | | | |
| Light bulbs | | | | |

| MECHANICAL | | | | |
|---|---|---|---|---|
| Water heater | | | | |
| Furnace | | | | |
| Air conditioner | | | | |
| Air cond. Filter | | | | |
| Smoke detector | | | | |
| Thermostat | | | | |

| LOCKS/KEYS | | | | |
|---|---|---|---|---|
| Door | | | | |
| Laundry Room | | | | |
| Mail Box | | | | |
| Common Area | | | | |
| Facility | | | | |

| GARAGE/CARPORT | | | | |
|---|---|---|---|---|
| Elec fixture | | | | |
| Light bulbs | | | | |
| Remote/Opener | | | | |

| FRONT PORCH | | | | |
|---|---|---|---|---|
| Elec fixture | | | | |
| Light bulbs | | | | |

| STORAGE | | | | |
|---|---|---|---|---|
| Elec fixture | | | | |
| Light bulbs | | | | |

| SIGNATURES | Dated | X | Dated | X |
|---|---|---|---|---|
| Resident | | | | |
| Management | | | | |

From the time of the initial inspection until the termination of the tenancy, the resident may remedy the deficiencies identified in the initial inspection, in a manner consistent with the rights and obligations of the parties under the rental agreement, in order to avoid charges for damages.

**COMMENTS**

On-Site

The Parks at Monterey Bay

PINNACLE
An American Management Services Company

# PET POLICIES

Apartment Community: <u>The Parks at Monterey Bay</u>
Apartment Address: <u>204 Salerno Rd., Seaside, CA  93955</u>
Resident Name(s): <u>Cheryl A. Adamski and Jason J. Adamski</u>

Apartments are not ideal environments for pets, consequently, a pet's acceptability on the premises must be based on the owner's control, his consideration of the property and his courteous concern for his neighbors. The following are the necessary policies to be observed by pet owners residing in the apartment community.

1. When a pet is acquired, a Pet Deposit, a Non-Refundable Pet Fee and a Monthly Pet Charge are required to be paid by Resident.

2. If Resident has more than one (1) pet, separate Pet Deposits, separate Non-Refundable Pet Fees and Monthly Pet Charges <u>are</u> required for EACH pet.

3. A pet cannot exceed 15 lbs. in weight.

4. In order to keep the grounds clean and sanitary, all pets must be taken outside perimeter of the community for their toilet purposes. It will be a violation of these policies if any Resident simply "turns out the pet" and recalls it at his convenience.

5. Pets must be "on leash" at all times when outside the apartment.

6. Pets are not to be tied or staked outside the apartment. Residents living in upstairs apartments with a balcony cannot leave the pet on the balcony for extended lengths of time.

7. Patios should be kept clean of pet droppings. During hot weather, especially, odors from such can be extremely offensive to neighbors. Also, please avoid leaving pet food outside for prolonged periods as it will attract pests.

8. Pets are NOT allowed in the pools or pool areas at any time.

9. The Residents will be asked to remove any pet that constantly bothers other Residents, whether inside or outside, or constitutes a problem or obstruction to the agents and employees of the Manager or Owner from properly performing their functions, duties and responsibilities. If Resident fails to remove said pet following complaints from the Residents and requests from Management, a Lease/Rental Agreement may be terminated.

These policies are to be strictly observed and will be enforced by the Management. We hope all Residents will understand that these policies have been made for their pleasure and convenience in order that this property may maintain a reputation of quality living. Please help us to maintain this reputation. The Management reserves the right to make such other reasonable policies as shall, in the judgment of the Management, from time to time become necessary to protect the care and cleanliness of the premises and for the preservation of good order therein.

Thank you for your cooperation in observing these policies.

Resident(s):

_Cheryl A. Adamski (Lessee)_                3/1/07 _Date_          _Jason J. Adamski (Lessee)_        3/1/07 _Date_

_(Owner/Agent)_        3-1-07 _Date_

On-Site

PINNACLE
An American Management Services Company

## SWIMMING POOL POLICY

Apartment Community: The Parks at Monterey Bay
Apartment Address: 204 Salerno Rd., Seaside, CA  93955
Resident Name(s): Cheryl A. Adamski and Jason J. Adamski

1.  Since the pool(s) are being used by many people, each Resident must be considerate of the rest of the Residents in the matter of inviting guests, as the Residents living there must have first consideration as to the use of the pool. It is suggested that Residents give careful thought to inviting guests on Saturdays and Sundays when most of the Residents will be home. No more than two (2) guests should be invited by any one Resident. Visitors are not permitted, and will be asked to leave, unless the Resident who has invited them is with them at the pool. Please register guests with the apartment office.

2.  Use only unbreakable containers in the pool areas.

3.  Be aware that excessive suntan oil in the pools can cause a great deal of damage to the pool and the associated equipment.

4.  For the protection of every Resident, we cannot allow anyone to use the pools if he has infectious disease, sore or inflamed eyes, a cold, nasal or ear discharge, open sores, or bandages of any kind.

5.  Receptacles have been provided for beverage cans, pop-top lids and other refuse. By using these receptacles, you can help in keeping the pool areas clean and free of litter.

6.  Because of health regulations, pets are FORBIDDEN in or around the pool areas. Regulation bathing suits must be worn for swimming at all times. NO CUT-OFFS. Ravelings and strings cause great damage to the pool pump, making repairs that take two (2) or three (3) days necessary.

7.  The ropes and life rings are not playtoys ... they are for a purpose. Do not hang or sit on the ropes. Profanity, horseplay, bicycle riding, skating, riding toys, scuffling or harassment of other swimmers will not be permitted.

8.  Persons under 11 MUST be accompanied by an adult.

_____    3/1/07         _____    3/1/07
Cheryl A. Adamski (Resident)       Date        Jason J. Adamski (Resident)        Date

_____    3-1-07
(Owner/Agent)                      Date

On-Site

PINNACLE
An American Management Services Company

# SMOKE DETECTION DEVICE ADDENDUM

| DEVICE:<br>YES ☐ NO ☐ | UNIT:<br>204 | LEASE DATE:<br><u>March 1, 2007</u> |
|---|---|---|
| BATTERY CHECK:<br>YES ☐ NO ☐ | TYPE: | DATE INSPECTED: |
| NEXT SCHEDULED INSPECTION: | | |

The above-described unit is equipped with a smoke detection device.

The Community has provided smoke detectors in all apartments. It is the responsibility of the Resident to test the smoke detector(s) once per month using the test button. DO NOT TEST THE ALARM WITH SMOKE! It is the responsibility of the Resident to immediately notify the Site Manager if a smoke detector is deficient in any manner. Site Manager shall make, or cause to be made, all necessary repairs to the Resident's smoke detector(s) provided the Resident has notified the Site Manager of the necessity of such repair.

This notice and your signature are required. By signing, you acknowledge that you have received a copy of this notice signed by Site Manager.

Thank you for your cooperation in observing this important safety feature.

_____  3/1/07      _____  3/1/07
Cheryl A. Adamski (Resident)   Date       Jason J. Adamski (Resident)   Date

_____  3-1-07
(Site Manager)   Date

27

On-Site

The Parks at Monterey Bay

PINNACLE
An American Management Service Company

## PET ADDENDUM

In connection with that certain Lease Agreement dated <u>March 1, 2007</u>, for Apartment , at Apartment Community, in <u>Seaside, CA</u> and subject to conditions stated therein, manager hereby grants permission for Resident to keep, in Resident's Apartment only, the pet described below upon the following terms and conditions:

1.  The pet's name is _____ which is a _____ (sex) and is approximately _____ years old.

2.  The pet is generally described by the following breed, height, weight and physical identifying characteristics:
    _____
    _____

3.  Resident hereby represents and warrants that the above-described pet has been properly licensed and inoculated as required by local law and Resident agrees to maintain such licensing and inoculation of the pet and to furnish Manager with evidence thereof promptly upon request.

4.  The pet shall be kept on a leash at all times when outside the Apartment and inside the Apartment Community. The pet shall not be exercised inside the Apartment Community except in designated exercise areas, if any. Resident shall not at any time leave the pet on a patio or balcony while away from the Apartment. Resident shall promptly collect and remove all pet defection from the grounds of the Apartment Community.

5.  Resident has hereby paid to Manager **$0.00** per animal as an additional fee securing Resident's performance under this Pet Addendum and the Lease Agreement. **N/A** per animal of said fee is non-refundable. Manager may deduct from the refundable portion of the fee all costs and expenses incurred by Manager in repairing all damages caused by the pet and any other damages resulting from the breach of this Pet Addendum or the Lease Agreement. Notwithstanding the deposit, Resident is responsible for all damages.

6.  Resident shall insure that the pet does not at any time disturb any other resident of the Apartment Community nor damage any property located in the Apartment or in the Apartment Community. If, in Manager's sole opinion and discretion, the pet has disturbed or is disturbing any other resident or has caused or is causing damage to property in the Apartment or Apartment Community then Resident shall permanently remove the pet from the Apartment and the Apartment Community within ten (10) after written request. Resident's payment for damage caused by the pet shall not entitle the Resident to keep the pet. Resident's failure to permanently remove the pet as provided above or failure to comply with all other terms of this Pet Addendum shall constitute a default permitting termination of the Lease Agreement.

7.  Except for the pet described above, Resident shall not keep any pets in the Apartment or within the Apartment Community without Owner's prior execution of an additional Pet Addendum.

8.  Resident's failure to comply with the terms and provisions of this Pet Addendum or violation of any representation or assurance contained in this Pet Addendum shall constitute a default permitting termination of the Lease Agreement.

In case of conflict between the provisions of this addendum and any other provisions of the lease, the provisions of the addendum shall govern.

*I have read and understood the policy and declare that I do not have any pet(s) at this time. It is clear to me that should I wish to keep pet(s) in the apartment in the future, an application has to be filed with the Management Co. prior to doing so.*

ALL RESIDENTS SIGN:

| | | | |
|---|---|---|---|
| _(signature)_ | 3/1/07 | _(signature)_ | 3/1/07 |
| Cheryl A. Adamski (Resident) | Date | Jason J. Adamski (Resident) | Date |
| _(signature)_ | 3-1-07 | | |
| (Owner/Agent) | Date | | |

28





# Protect Your Family From Lead In Your Home

  United States Environmental Protection Agency

 United States Consumer Product Safety Commission

 United States Department of Housing and Urban Development

U.S. EPA Washington DC 20460
U.S. CPSC Washington DC 20207
U.S. HUD Washington DC 20410

EPA747-K-99-001
June 2003

## Are You Planning To Buy, Rent, or Renovate a Home Built Before 1978?

Many houses and apartments built before 1978 have paint that contains lead (called lead-based paint). Lead from paint, chips, and dust can pose serious health hazards if not taken care of properly.

 OWNERS, BUYERS, and RENTERS are encouraged to check for lead before renting, buying, or renovating pre-1978 housing.

Federal law requires that individuals receive certain information before renting, buying, or renovating pre-1978 housing:

 LANDLORDS have to disclose known information on lead-based paint and lead-based paint hazards before leases take effect. Leases must include a disclosure form about lead-based paint.

 SELLERS have to disclose known information on lead-based paint and lead-based paint hazards before selling a house. Sales contracts must include a disclosure form about lead-based paint. Buyers have up to 10 days to check for lead hazards.

 RENOVATORS have to give you this pamphlet before starting work. (After June 1, 1999.)

This document is in the public domain. It may be reproduced by an individual or organization without permission. Information provided in this booklet is based upon current scientific and technical understanding of the issues presented and is reflective of the jurisdictional boundaries established by the statutes governing the co-authoring agencies. Following the advice given will not necessarily provide complete protection in all situations or against all health hazards that can be caused by lead exposure.

---

## IMPORTANT!

### Lead From Paint, Dust, and Soil Can Be Dangerous If Not Managed Properly

**FACT:** Lead exposure can harm young children and babies even before they are born.

**FACT:** Even children who seem healthy can have high levels of lead in their bodies.

**FACT:** People can get lead in their bodies by breathing or swallowing lead dust, or by eating soil or paint chips containing lead.

**FACT:** People have many options for reducing lead hazards. In most cases, lead-based paint that is in good condition is not a hazard.

**FACT:** Removing lead-based paint improperly can increase the danger to your family.

If you think your home might have lead hazards, read this pamphlet to learn some simple steps to protect your family.

## Lead Gets in the Body in Many Ways

**Childhood lead poisoning remains a major environmental health problem in the U.S.**

People can get lead in their body if they:
- Breathe in lead dust (especially during renovations that disturb painted surfaces).
- Put their hands or other objects covered with lead dust in their mouths.
- Eat paint chips or soil that contains lead.

*Even children who appear healthy can have dangerous levels of lead in their bodies.*

**Lead is even more dangerous to children under the age of 6:**
- Children's brains and nervous systems are more sensitive to the damaging effects of lead.
- Children's growing bodies absorb more lead.
- Babies and young children often put their hands and other objects in their mouths. These objects can have lead dust on them.



**Lead is also dangerous to women of childbearing age:**
- Women with a high lead level in their system prior to pregnancy would expose a fetus to lead through the placenta during fetal development.

## Lead's Effects

It is important to know that even exposure to low levels of lead can severely harm children.

**In children, lead can cause:**
- Nervous system and kidney damage.
- Learning disabilities, attention deficit disorder, and decreased intelligence.
- Speech, language, and behavior problems.
- Poor muscle coordination.
- Decreased muscle and bone growth.
- Hearing damage.

While low-level exposure is most common, exposure to high levels of lead can have devastating effects on children, including seizures, unconsciousness, and in some cases, death.

Although children are especially susceptible to lead exposure, lead can be dangerous for adults too.

**In adults, lead can cause**
- Increased chance of illness during pregnancy.
- Harm to a fetus, including brain damage or death.
- Fertility problems (in men and women).
- High blood pressure.
- Digestive problems.
- Nerve disorders.
- Memory and concentration problems.
- Muscle and joint pain.



*Lead affects the body in many ways.*

## Where Lead-Based Paint Is Found

**In general, the older your home, the more likely it has lead-based paint.**

Many homes built before 1978 have lead-based paint. The federal government banned lead-based paint from housing in 1978. Some states stopped its use even earlier. Lead can be found:
- In homes in the city, country, or suburbs.
- In apartments, single-family homes, and both private and public housing.
- Inside and outside of the house.
- In soil around a home. (Soil can pick up lead from exterior paint or other sources such as past use of leaded gas in cars.)

## Checking Your Family for Lead

**Get your children and home tested if you think your home has high levels of lead.**

To reduce your child's exposure to lead, get your child checked, have your home tested (especially if your home has paint in poor condition and was built before 1978), and fix any hazards you may have. Children's blood lead levels tend to increase rapidly from 6 to 12 months of age, and tend to peak at 18 to 24 months of age.

Consult your doctor for advice on testing your children. A simple blood test can detect high levels of lead. Blood tests are usually recommended for:
- Children at ages 1 and 2.
- Children or other family members who have been exposed to high levels of lead.
- Children who should be tested under your state or local health screening plan.

Your doctor can explain what the test results mean and if more testing will be needed.

## Identifying Lead Hazards

Lead-based paint is usually not a hazard if it is in good condition, and it is not on an impact or friction surface, like a window. It is defined by the federal government as paint with lead levels greater than or equal to 1.0 milligram per square centimeter, or more than 0.5% by weight.

Deteriorating lead-based paint (peeling, chipping, chalking, cracking or damaged) is a hazard and needs immediate attention. It may also be a hazard when found on surfaces that children can chew or that get a lot of wear-and-tear, such as:
- Windows and window sills.
- Doors and door frames.
- Stairs, railings, and banisters.
- Porches and fences.

**Lead from paint chips, which you can see, and lead dust, which you can't always see, can both be serious hazards.**

Lead dust can form when lead-based paint is scraped, sanded, or heated. Dust also forms when painted surfaces bump or rub together. Lead chips and dust can get on surfaces and objects that people touch. Settled lead dust can re-enter the air when people vacuum, sweep, or walk through it. The following two federal standards have been set for lead hazards in dust:
- 40 micrograms per square foot and higher for floors, including carpeted floors.
- 250 micrograms per square foot and higher for interior window sills.

Lead in soil can be a hazard when children play in bare soil or when people bring soil into the house on their shoes. The following two federal standards have been set for lead hazards in residential soil:
- 400 parts per million (ppm) and higher in play areas or bare soil.
- 1,200 ppm (average) and higher in bare soil in the remainder of the yard.

The only way to find out if paint, dust and soil lead hazards exist is to test for them. The next page describes the most common methods used.

## Checking Your Home for Lead Hazards

**Just knowing that a home has lead-based paint may not tell you if there is a hazard.**

You can get your home tested for lead in several different ways:
- A paint inspection tells you whether your home has lead-based paint and where it is located. It won't tell you whether or not your home currently has lead hazards.
- A risk assessment tells you if your home currently has any lead hazards from lead in paint, dust, or soil. It also tells you what actions to take to address any hazards.
- A combination risk assessment and inspection tells you if your home has any lead hazards and if your home has any lead-based paint, and where the lead-based paint is located.

Hire a trained and certified testing professional who will use a range of reliable methods when testing your home.



Trained professionals use a range of methods when checking your home, including:
- Visual inspection of paint condition and location.
- A portable x-ray fluorescence (XRF) machine.
- Lab tests of paint, dust, and soil samples.

There are state and federal programs in place to ensure that testing is done safely, reliably, and effectively. Contact your state or local agency (see bottom of page 11) for more information, or call 1-800-424-LEAD (5323) for a list of contacts in your area.

**Home test kits for lead are available, but studies suggest that they are not always accurate. Consumers should not rely on these tests before doing renovations or to assure safety.**

## What You Can Do Now To Protect Your Family

If you suspect that your house has lead hazards, you can take some immediate steps to reduce your family's risk:

- If you rent, notify your landlord of peeling or chipping paint.
- Clean up paint chips immediately.
- Clean floors, window frames, window sills, and other surfaces weekly. Use a mop or sponge with warm water and a general all-purpose cleaner or a cleaner made specifically for lead. REMEMBER: NEVER MIX AMMONIA AND BLEACH PRODUCTS TOGETHER SINCE THEY CAN FORM A DANGEROUS GAS.
- Thoroughly rinse sponges and mop heads after cleaning dirty or dusty areas.
- Wash children's hands often, especially before they eat and before nap time and bed time.
- Keep play areas clean. Wash bottles, pacifiers, toys, and stuffed animals regularly.
- Keep children from chewing window sills or other painted surfaces.
- Clean or remove shoes before entering your home to avoid tracking in lead from soil.
- Make sure children eat nutritious, low-fat meals high in iron and calcium, such as spinach and dairy products. Children with good diets absorb less lead.





## Reducing Lead Hazards In The Home



**Removing lead improperly can increase the hazard to your family by spreading even more lead dust around the house.**

*Always use a professional who is trained to remove lead hazards safety.*



In addition to day-to-day cleaning and good *nutrition*:

- You can temporarily reduce lead hazards by taking actions such as repairing damaged painted surfaces and planting grass to cover soil with high lead levels. These actions (called "interim controls") are not permanent solutions and will need ongoing attention.
- To permanently remove lead hazards, you must hire a certified lead "abatement" *contractor*. Abatement (or permanent hazard elimination) methods include removing, sealing, or enclosing lead-based paint with special materials. Just painting over the hazard with regular paint is not enough.

Always hire a person with special training for correcting lead problems–someone who knows how to do this work safely and has the proper equipment to clean up thoroughly. Certified contractors will employ qualified workers and follow strict safety rules as set by their state or by the federal government.

Once the work is completed, dust cleanup activities must be repeated until testing indicates that lead dust levels are below the following:

- 40 micrograms per square foot for floors, including carpeted floors;
- 250 micrograms per square foot for interior windows sills; and
- 400 micrograms per square foot for window troughs.

Call your state or local agency for help in locating certified professionals in your area and to see if financial assistance is available.

## Remodeling or Renovating a Home With Lead-Based Paint

Take precautions before your contractor or you begin remodeling or renovations that disturb painted surfaces (such as scraping off paint or tearing out walls):

- Have the area tested for lead-based paint.
- Do not use a belt-sander, propane torch, heat gun, dry scraper, or dry sandpaper to remove lead-based paint. These actions create large amounts of lead dust and fumes. Lead dust can remain in your home long after the work is done.
- Temporarily move your family (especially children and pregnant women) out of the apartment or house until the work is done and the area is properly cleaned. If you can't move your family, at least completely seal off the work area.
- Follow other safety measures to reduce lead hazards. You can find out about other safety measures by calling 1-800-424-LEAD. Ask for the brochure "Reducing Lead Hazards When Remodeling Your Home." This brochure explains what to do before, during, and after renovations.

If you have already completed renovations or remodeling that could have released lead-based paint or dust, get your young children tested and follow the steps outlined in the section labeled "What you can do now to protect your family."



**If not conducted properly, certain types of renovations can release lead from paint and dust into the air.**

## Other Sources of Lead



*While paint, dust, and soil are the most common lead hazards, other lead sources also exist.*



- **Drinking water.** Your home might have plumbing with lead or lead solder. Call your local health department or water supplier to find out about testing your water. You cannot see, smell, or taste lead, and boiling your water will not get rid of lead. If you think your plumbing might have lead in it:
  - Use only cold water for drinking and cooking.
  - Run water for 15 to 30 seconds before drinking it, especially if you have not used your water for a few hours.
- **The job.** If you work with lead, you could bring it home on your hands or clothes. Shower and change clothes before coming home. Launder your work clothes separately from the rest of your family's clothes.
- Old painted toys and **furniture.**
- Food and liquids stored in **lead crystal** or **lead-glazed pottery** or **porcelain.**
- **Lead smelters** or other industries that release lead into the air.
- **Hobbies** that use lead, such as making pottery or stained glass, or refinishing furniture.
- Folk remedies that contain lead, such as "greta" and "azarcon" used to treat an upset stomach.

## For More Information

### The National Lead Information Center

Call **1-800-424-LEAD** to learn how to protect children from lead poisoning and for other information on lead hazards. (Internet: **www.epa.gov/lead and www.hud.gov/lea).**

For the hearing impaired, call the Federal Information Relay Service at **1-800-877-8339** and ask for the National Lead Information Center at **1-800-424-LEAD.**



### EPA's Safe Drinking Water Hot-line

• Call **1-800-426-4791** for information about lead in drinking water.

### Consumer Product Safety Commission Hot-line

To request information on lead in consumer products, or to report an unsafe consumer product or a product-related injury call **1-800-638-2772.** (Internet: www.cpsc.gov). For the hearing impaired, call TDD **1-800-638-8270.**



### Health and Environmental Agencies

Some cities and states have their own rules for lead-based paint activities. Check with your state agency to see if state or local laws apply to you. Most state agencies can also provide information on finding a lead abatement firm in your area, and on possible sources of financial aid for reducing lead hazards. Receive up-to-date address and phone information for state and local contacts on the Internet at **www.epa.gov/lead** or contact the National Lead Information Center at **1-800-424-LEAD.**

## CPSC Regional Offices

Your Regional CPSC Office can provide further information regarding regulations and consumer product safety.

**Eastern Regional Center** Consumer Product Safety Commission
201 Varick Street, Room 903
New York, NY 10014
(212) 620-4120

**Central Regional Center** 230 South Dearborn Street, Room 2944
Chicago, IL 60604
(312) 353-8260

**Western Regional Central** 1301 Clay Street, Suite 610-N
Oakland, CA 94612
(510) 637-4060

## HUD Lead Office

Please contact HUD's Office of Lead Hazard Control for information on lead regulations, outreach efforts, and lead hazard control and research grant programs.

U.S. Department of Housing and Urban Development
Office of Healthy Homes and Lead Hazard Control
451 Seventh Street, SW, P-3206
Washington, DC 20410
(202) 755-1785

## EPA Regional Offices

Your Regional EPA Office can provide further information regarding regulations and lead protection programs.

### EPA Regional Offices

**Region 1** (Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)
Regional Lead Contact
U.S. EPA Region 1
Suite 1100 (CPT)
One Congress Street
Boston, MA 02114-2023
1 (888) 372-7341

**Region 2** (New Jersey, New York, Puerto Rico, Virgin Islands)
Regional Lead Contact
U.S. EPA Region 2
2890 Woodbridge Avenue
Building 209, Mail Stop 225
Edison, NJ 08837-3679
(732) 321-6671

**Region 4** (Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)
Regional Lead Contact
U.S. EPA Region 4
61 Forsyth Street, SW
Atlanta, GA 30303
(404) 562-8998

**Region 3** (Delaware, Washington DC, Maryland, Pennsylvania, Virginia, West Virginia)
Regional Lead Contact
U.S. EPA Region 3 (3WC33)
1650 Arch Street
Philadelphia, PA 19103
(215) 814-5000

**Region 5** (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)
Regional Lead Contact
U.S. EPA Region 5 (DT-8J)
77 West Jackson Boulevard
Chicago, IL 60604-3666
(312) 886-6003

**Region 6** (Arkansas, Louisiana, New Mexico, Oklahoma, Texas)
Regional Lead Contact
U.S. EPA Region 6
1445 Ross Avenue, 12th Floor
Dallas, TX 75202-2733
(214) 665-7577

**Region 7** (Iowa, Kansas, Missouri, Nebraska)
Regional Lead Contact
U.S. EPA Region 7 (ARTD-RALI)
901 N. 5th Street
Kansas City, KS 66101
(913) 551-7020

**Region 8** (Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)
Regional Lead Contact
U.S. EPA Region 8
999 18th Street, Suite 500
Denver, CO 80202-2466
(303) 312-6021

**Region 9** (Arizona, California, Hawaii, Nevada)
Regional Lead Contact
U.S. EPA Region 9
75 Hawthorne Street
San Francisco, CA 94105
(415) 744-1124

**Region 10** (Idaho, Oregon, Washington, Alaska)
Regional Lead Contact
U.S. EPA Region 10
Toxics Section WCM-128
1200 Sixth Avenue
Seattle, WA 98101-1128
(206) 553-1985

## Simple Steps To Protect Your Family From Lead Hazards

**If you think your home has high levels of lead:**

• Get your young children tested for lead, even if they seem healthy.
• Wash children's hands, bottles, pacifiers, and toys often.
• Make sure children eat healthy, low-fat foods.
• Get your home checked for lead hazards.
• Regularly clean floors, window sills, and other surfaces.
• Wipe soil off shoes before entering house.
• Talk to your landlord about fixing surfaces with peeling or chipping paint.
• Take precautions to avoid exposure to lead dust when remodeling or renovating (call 1-800-424-LEAD for guidelines).
• Don't use a belt-sander, propane torch, dry scraper, or dry sandpaper on painted surfaces that may contain lead.
• Don't try to remove lead-based paint yourself.

PINNACLE
An American Management Services Company

# SATELLITE DISH AND ANTENNA GUIDELINES

Under the rules of the Federal Communications Commission (FCC), Resident has a right to install a satellite dish and /or receiving antenna within the leased premises. Owner/Agent is allowed to impose reasonable restrictions relating to the installation and maintenance of the Satellite dish and receiving antenna. Resident is required to comply with these restrictions as a condition of installing such equipment. This addendum contains the restrictions Resident agrees to follow:

**A. Number and size:** Resident may install only one satellite dish or antenna within the premises that are leased to Resident for Resident's exclusive use. A satellite dish may not exceed 39 inches in diameter. An antenna or dish may receive but not transmit signals.

**B. Location** of the satellite dish or antennas is limited to (1) inside Resident's dwelling, or (2) in an area outside Resident dwelling such as Residents balcony, patio, etc. of which Resident has exclusive use under lease/rental agreement. **Installation is not permitted on any parking areas, roofs, exterior wall, window, fence or common area, or in an area that other Residents are allowed to use.** A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to Resident for Residents exclusive use.

**C. Safety and non-interference:** Resident's installation: (1) must comply with reasonable safety standards; (2) may not interfere with Owner/Agents cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to Owner's/Agents telecommunications systems; and (4) may not be connected to Owner/Agents electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of three methods: (1) securely attaching to a portable, heavy object; (2) clamping it to a part of the building's exterior that lies within Resident's leased premises (such as a balcony or patio railing); or (3) any other method approved by owner/Agent. No other methods are allowed. Owner/Agent may require that Resident block the satellite dish or antenna with plants, etc., so long as it does not impair Residents reception.

**D. Signal transmissions from exterior dish or antenna to interior of dwelling:** Resident may not damage or alter the leased premises and may not drill holes through outside walls, door jams, window sills, etc. If Resident's satellite dish or antenna is installed outside Resident's living area (on balcony, patio, or yard of which Resident has exclusive use under lease), signals received by Resident's satellite dish or antenna may be transmitted to the interior of Resident's dwelling only by: (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accommodate the cable); or (3) any other method approved by Owner/Agent.

**E. Workmanship:** For safety purposes, Resident must obtain Owner/Agent approval of: (1) the strength and type of materials to be used for installation; and (2) the person or company who will perform the installation. Installation must be done by a qualified person, or a company that has workers' compensation insurance and adequate public liability insurance. Owner/Agents approval will not be unreasonably withheld. Resident must obtain any permits required by local ordinances for the installation and comply with any applicable local ordinances and state laws.

**F. Maintenance:** Resident will have the sole responsibility of maintaining Resident's satellite dish or antenna and all related equipment. Owner/Agent may temporarily remove the satellite dish or antenna if necessary to make repairs to the building.

**G. Removal and damages:** Resident must remove the satellite dish or antenna and all related equipment when Resident moves out of the dwelling. Resident must pay for any damages and for the cost of repairs or repainting which may be reasonably necessary to restore the leased premises to its condition prior to the installation of Resident's satellite dish or antenna and related equipment.

**H. When Resident may begin installation:** Resident may start installation of satellite dish or antenna only after Resident has: (1) signed this addendum; (2) provided Owner/Agent with written evidence of the liability insurance referred to in paragraph 8 of the addendum; and (3) received Owner/Agent's written approval of the installation materials and the person or company who will do the installation.

Cheryl A. Adamski (Resident)    Date: 3/1/07

Jason J. Adamski (Resident)    Date: 3/1/07

(Owner/Agent)    Date: 3-1-0

Initials    Initials

26

On-Site



Dear Parks at Monterey Bay Resident,

It has recently come to our attention that a registered offender is currently residing on the premises and we wanted our residents to be aware that such an individual is living in this community.

Please note that because of our legal obligations to respect the privacy rights of all of our residents, we cannot disclose the identity of this individual. In addition, penal code section 290.4 (e) (2) specifically prohibits us from taking any adverse action against this resident because of his or her registrant status. We must also enforce our lease agreement with respect to the registrant's right as well. Therefore, we cannot allow any harassment of this resident or other disruption of his or her quiet enjoyment.

Attached to this letter is an informational flyer created by the Staff Jude Advocate for the Presidio of Monterey, with endorsement from Command. This flyer addresses the details and legalities surrounding Megan's Law and any law applicable to this specific situation. We ask that you please note that paragraph six on the flyer announces a special town hall to further address this situation.

If you would like more information regarding this position, please contact the City of Seaside Police Department at (831) 899-6748.


Respectfully,



Stacia Schuster
Community Director
The Parks at Monterey Bay





Exhibit B



**DEPARTMENT OF THE ARMY**
UNITED STATES ARMY INSTALLATION MANAGEMENT COMMAND
HEADQUARTERS, US ARMY GARRISON, PRESIDIO OF MONTEREY
1759 LEWIS ROAD, SUITE 210
MONTEREY, CA 93944-3223

REPLY TO
ATTENTION OF

21 May 2007

Office of the Garrison Commander

Mr. Jason J. Adamski
204 Salerno Road
Seaside, California 93955

Dear Mr. Adamski:

As the Garrison Commander of the Presidio of Monterey and Ord Military Community, I hereby notify you that, effective June 21, 2007, you are barred from the Presidio of Monterey Base Complex, which consists of the Presidio of Monterey and the Ord Military Community. Thereafter, you will not reenter or be found within the limits of the Presidio of Monterey Base Complex at any time unless federal judicial authorities or law enforcement personnel request your presence. Any travel conducted on or within the Presidio of Monterey Base Complex pursuant to this exception shall be limited to the most direct route to and from the location where you are to appear.

This action is being taken because your residence in a military housing community as a registered sex offender affects the good order and discipline of the military community, which I am responsible for maintaining. You failed to indicate on your rental application that you had been previously convicted of a felony sex offense, and your presence is affecting the well-being of other residents in the military housing community. As the Garrison Commander, I must consider the entire community's welfare, well-being and security.

If you violate this notice, you are subject to prosecution for violating Title 18, Section 1382, of the United States Code, which reads in part as follows:

"Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station or installation, for any purpose prohibited by law or lawful regulation; or

Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof –

Shall be fined under this title or imprisoned not more than six months, or both."

You are further informed that if you reenter or are found within the limits of the Presidio of Monterey Base Complex in violation of this directive, you will be subject to apprehension and detention by the Presidio of Monterey Police Department for prompt delivery to the appropriate civil authorities.

Sincerely,

Pamela L. Martis
Colonel, US Army
Commanding

Signed                                                    Date

EXhibit C